Violet Virginia Kohagen BORIS, administratrix d.b.n.c.t.a. of the estate of F. C. Kohagen, deceased, and Martha Armonies and Georgiana Callahan and Lyle Trucker, Plaintiffs,

v.

James R. MOORE and Hamilton Manufacturing Company, a corporation, Defendants.

Civ. A. No. 4724.

United States District Court
E. D. Wisconsin.

June 12, 1957.

Culhane & Culhane, Minneapolis, Minn., and John J. Burke and Gerald P. Hayes, Sr., Milwaukee, Wis., of counsel, for plaintiffs.

Leonard, Street & Deinard by Benedict S. Deinard, Minneapolis, Minn., Robert A. Hess, Milwaukee, Wis., of counsel, for defendant James R. Moore.

A. F. Rankin, Manitowoc, Wis., for defendant Hamilton Mfg. Co.

GRUBB, District Judge.

This action is brought for certain patent royalties, the rights to which are alleged to have arisen prior to October 1937. The complaint was dismissed as to the defendant Moore by order of this court of even date herewith, 152 F.Supp. 595, on the ground it failed to state a claim against him upon which relief could be granted.

The issue of liability having been severed from the issue of damages, and the separate defense of laches having been then severed from the other issues on liability, the issue and separate defense of laches was tried before the court during the period from December 26, 1956, to January 17, 1957. The only question now before the court is: Whether it is established that the plaintiffs are barred by laches or estopped from asserting their claims.

The merits of the liability question were not litigated at the hearing on this separate issue. The court assumes, for the purpose of this decision, that the plaintiffs had the rights they allege, and finds that such rights arose at the time alleged, i. e. prior to October 1937.

A brief history of this case is as follows: Prior to October 1937 the plaintiffs acquired from Moore certain rights in the royalties from a clothes dryer machine that Moore invented. On April 8, 1937, the plaintiffs, Moore, and other persons organized the Universal Dryer Co. for the purpose of exploiting the dryer. Moore contracted with the Universal Co. to make it his exclusive licensee. The plaintiffs, Moore, and others had shares in Universal. These shareholders were, at this time, in a position to enjoy any profits that Universal might realize as Moore's exclusive licensee. On October 23, 1937, J. G. Callahan, under whom one of the plaintiffs claims, the President of Universal, died. On December 4, 1937, the plaintiffs and the other shareholders in Universal entered an agreement to dissolve the Universal Co.; Moore licensed one Storm Manufacturing Co. exclusively to manufacture and sell the dryer; the plaintiffs were made third party beneficiaries of the Storm license contract in the same percentages in the royalties as are alleged in the complaint. On July 28, 1938, after the Storm Co. had manufactured only a very few, if any, dryers, the Storm Co. license contract was cancelled by Moore and the Storm Co. Subsequently, on November 5, 1938, Moore assigned his patent rights to one F. W. Griswold. On November 9, 1938, Griswold licensed the Imperial Appliance Corp. to manufacture and sell the dryer. On November 10, 1938, Imperial contracted with the defendant Hamilton Co. to allow Hamilton to manufacture the dryer. Thereafter, on November 29, 1941, Imperial sublicensed Hamilton to manufacture and sell the dryer, the contract to be effective January 1, 1942. Hamilton first manufactured dryers during 1939, and continued to do so at an increasing annual rate until 1943, when the war forced a considerable reduction in manufacture and sales. It was not until 1946 that very substantial manufacture and sales were resumed, although some machines were produced and sold in each

of 1943, 1944 and 1945. The instant action was commenced on June 10, 1949.

From time to time this opinion will note other incidents, contracts, demands, etc., that various parties to this lawsuit contend are relevant and material. The court is of the opinion that the foregoing is a complete chronology of the *pertinent* facts as far as the issue and separate defense of laches is concerned, except for those contributing to the issue of the defendants' prejudice.

■ The law of the defense of laches is generally very well settled. Laches is an inexcusable, unreasonable, or prejudicial delay in the assertion of a right to the disadvantage or injury of another. Rome Grader & Machinery Corp. v. J. D. Adams Mfg. Co., 7 Cir., 1943, 135 F.2d 617; Universal Coin Lock Co. v. American Sanitary Lock Co., 7 Cir., 1939, 104 F.2d 781; Potash Co. of America v. International Minerals & Chemical Corp., 10 Cir., 1954, 213 F.2d 153. Laches may also be expressed as being a lack of diligence in prosecuting a claim to the injury of another. The person accused of the delay must have known, or should have known, of the rights which it is asserted he was dilatory in urging. Lapse of time alone does not establish the defense.

■ The defense is equitable, and it is precisely a balancing of equities, or equitable considerations, in the individual case that the court should employ in reaching its decision. It is in the sound discretion of the trial court to determine whether or not the equities of the case before it warrant a finding of laches, to prevent injustice. Laursen v. O'Brien, 7 Cir., 1937, 90 F.2d 792.

■ While passage of time alone does not establish the defense, it is an essential element. Analogous statutes of limitation are not conclusive but rather useful as aids in determining the equities. See Holmberg v. Armbrecht, 1946, 327 U.S. 392, 66 S.Ct. 582, 90 L.Ed. 743.

■ Possibly the single general principle remaining to be stated is that the delay, which the defense contemplates, is not delay in bringing claims to the attention of the defendant. It is " * * * *delay* on the part of the plaintiff *in instituting litigation* on his claims * * *." (Emphasis supplied.) Brennan v. Hawley Products Co., 7 Cir., 1950, 182 F.2d 945, 948.

■ Additional relevant facts in the instant case are that on November 21, 1941, Harry C. Gowran died, and on February 15, 1948, Clarence Clago died. At the time Hamilton acquired its manufacturing contract from Imperial, and at the time Griswold licensed Imperial, on November 10th and 9th of 1938, respectively, Gowran was the president of Hamilton, and Clago was the president of Imperial. Gowran and Clago were the principal negotiators between the two companies during their relationship in 1938. The records of the Storm Co. were apparently removed from Minneapolis to Texas in February or March of 1949. In any case, the defendants assert that these are not any longer available, and no one has demonstrated that they are.

When Hamilton took on the manufacture of this dryer machine in 1938, the success of the venture was by no means assured. The product was new, and Hamilton had no experience in sales of laundry equipment. At the time Hamilton took on the manufacture of the dryer in 1938–1939 the dryer was, in the words of Hamilton's then vice-president, "crude"; "it had not been engineered". There was no tumbler-type clothes dryer on the market at that time. It was unknown whether the public would accept the device. In 1938 and early 1939 the dryer had neither the approval of Underwriters' Laboratories nor of the American Gas Association. The development of this product and its manufacture and sale resulted in a loss to the defendant Hamilton of $77,599 from 1938 through 1941. At the close of 1946, the defendant Hamilton had experienced a net loss of nearly $300,000.

The second element of prejudice to the defendants is made out clearly to the satisfaction of the court. The deaths of Gowran and Clago, the unavailability of

the Storm Co. records, and the financial change of position of Hamilton alone are sufficient in this regard. The plaintiffs' position that it was Hamilton's duty, as a licensee, to exploit the patent, and that therefore Hamilton sustained no prejudice in doing what it was legally obligated to do in any case, does not impress the court. Hamilton may be presumed to have entered upon this undertaking in the first instance only with the assurance that it was dealing with the exclusive licensee of the only owner of the patent involved. It is not well taken to assert that one is not prejudiced because he obligated himself legally to do what he would never have begun or pursued had he known of the rights he alleges the plaintiff was dilatory in enforcing.

Had the plaintiffs brought the instant action promptly, the defendant Hamilton (as well as Moore, if the plaintiffs had claimed affirmative relief from him) could have paid the royalties into court, or retained them in its own hands and taken the proper measures to have the validity of the conflicting claims judicially determined. As an alternative, had the plaintiffs brought the instant action seasonably, Hamilton could have tendered its defense to the group of persons to whom Hamilton was, in fact, paying the royalties (hereinafter called "the Harwood group"), and thereby caused them to be bound by the judgment of the court, and avoid the hazard of subsequent litigation that might be instituted by the "Harwood group" to recover royalties in which the plaintiffs could establish interests in the litigation.

It is the first element of the defense that is most vigorously attacked by the plaintiffs. For the purpose of the issue, it will be assumed that the plaintiffs had rights, as alleged in the complaint, and that these rights arose prior to October 1937, also as alleged in the complaint. There was then a delay of nearly twelve years, at least, between the origin of plaintiffs' rights and the date this action was commenced (i. e. from some time prior to October 1937 to June 10, 1949). Hamilton acquired its first rights in the manufacture of the clothes dryer in question on November 10, 1938, from which date it is approximately ten and one-half years until the instant action was begun. The only other relevant computation of this sort arises because the plaintiffs claim royalties only in the machines manufactured *and sold*. Hamilton had only a manufacture contract until November 29, 1941, when it entered a sublicense agreement to manufacture *and sell*, to be effective on January 1, 1942. It is seven and one-half years from that date until the instant action was commenced. By the close of 1942 there had been manufactured *and sold* sufficient machines that royalties in the amount of $6,279 had accumulated, in which the plaintiffs claim a total of 65%, or $3,981.35. (The complaint alleges a royalty of $3 per machine in Hamilton license contract.) Previous to December 31, 1941, there were manufactured enough machines to accumulate $7,455, in which the plaintiffs' claim of 65% would amount to $4,845.75. If it is taken that Hamilton "sold" machines exclusively to the licensee with whom it had its manufacturing contract at this time, then there were substantial royalties already accrued more than seven and one-half years before this case was commenced. In any event, the plaintiffs demonstrate no excuse for not suing Imperial at this time. Certainly the plaintiffs have not any less delayed because their failure to enforce their claims at the time Hamilton had only a manufacturing contract with Imperial was a failure to sue Imperial.

Plaintiffs have argued in excuse of their delay during this time-period that only machines *manufactured and sold* after January 1, 1942, may be considered, and that furthermore, they claim no interest in the first $6,454.52 of royalties. The theory here is that all licensees (particularly defendant Hamilton, since the amount was never paid anyone else) are obliged, as a term of their licenses, to repay the Storm Co. that amount of money. It appears that at the time the Universal Co. was dissolved, its shareholders already contemplated that in con-

sideration of their abandoning their interests in the Universal Co., Moore would license the Storm Co. and contract in such way that they were third party beneficiaries of the contract. The paragraph of the Storm Co. license contract that is relevant in this regard is—

"It is understood by and between the parties hereto that *Storm is to retain* the first and sufficient subsequent royalties which would otherwise be due and payable hereunder *until Storm has refunded to itself* all monies paid by Storm to counsel to date of this agreement and to (be) paid hereafter in connection with the corporation affairs of Universal Dryer Company, dissolving said corporation, etc.; all monies already paid and hereafter to be paid by Storm to counsel for patent work in connection with the obtaining of patents upon the above identified application, and upon future improvement applications, as well as in connection with investigation of the patent situation surrounding the present subject matter; and all monies as have been or may hereafter be spent by Storm in connection with any individual or concern showing rightful and legitimate claim against Moore and/or Universal Dryer Company in connection with the present subject matter; it being expressly understood that the *monies intended to be refunded by Storm to itself* under the present Section X are to be deducted absolutely from royalties, and that each of the parties hereinbefore listed to receive royalty payments shall have deducted from his or her share a proportionate amount of the total required to liquidate an obligation due or to become due from Moore and/or Universal Dryer Company to Storm." (Parenthesis and emphasis supplied.)

There is absolutely no evidence that this Storm debt was ever brought to the attention of Hamilton. The plaintiffs' theory that they are excused from having claimed royalties from Hamilton until after more than $6,454.52 in royalties had accrued is not well taken. That was a term of a particular license contract no longer operative. If similar provisions were incorporated in license contracts to persons or firms other than the defendant Hamilton, that is wholly immaterial to the issue presently before this court. There is no evidence that Hamilton had any knowledge of the plaintiffs' claims, nor of the $6,454.52 Storm Co. debt. Neither did the plaintiffs notify Hamilton of the claims, and of the claim that they were contingent upon the debt being first liquidated.

The plaintiffs rely in excuse of their inaction upon the fact that they have asserted their rights in correspondence among themselves, as well as with Moore. As to the first correspondence, it is wholly immaterial what thoughts, claims, or deliberations the plaintiffs communicated to one another. As to the second, the defendant Hamilton's contention that Moore is not, and was never, the agent of Hamilton in this respect is completely sustained by the evidence. There is no evidence to support the proposition that Moore's relationship to Hamilton was ever more than that of an employee charged with mechanic's duties of helping develop the clothes dryer to a state of commercial success. His duties were exclusively those of a mechanic. He never had authority to deal for or bind Hamilton contractually, except possibly to pay the relatively small salary of a field assistant.

A relevant case from the Court of Appeals (7th), involving somewhat analogous facts, is Brennan v. Hawley Products Co., supra. In that case two patents were issued to the plaintiff in 1933. A third patent was issued in 1937. The plaintiff orally charged the defendant with infringement of one of the 1933 patents in 1934, and orally charged infringement of both 1933 patents in 1937. The defendant received plaintiff's written charge of infringement of both 1933 patents in 1939. The plaintiff knew in 1939 that the dispute could not be settled without a lawsuit. The president of the de-

fendant company, and its patent attorney, died in 1946. Later in 1946 the plaintiff sent written notice of infringement of the 1937 patent to the defendant. The defendant company spent and invested large sums of money from 1937 until the suit was instituted in June 1947. The court reviews a number of its decisions on the issue of laches, and then affirms the trial court's dismissal of the complaint because of laches. The court said:

"* * * the record shows not only a long delay on the part of the plaintiff in instituting litigation on his claims of infringement, but also such a change in the condition of the defendant that it would be inequitable to allow plaintiff to enforce his claim for infringement. Not only has the defendant expended large sums of money in the extension of its manufacturing facilities, but two of its most important witnesses have passed away. The plaintiff offers no legally adequate excuse for his inaction. Lack of funds is not claimed * * *. His civilian employment during the war period is certainly insufficient to justify his failure to act * * *." [182 F.2d 948.]

The time delay in the Brennan case was between ten and thirteen years (depending upon which 1933 patent is considered, although the court declared that it was immaterial which of the three patents was considered since they were all very much alike). In the case now before the court, the delay is approximately ten years between the time Hamilton had begun development and exploitation of the dryer (and the plaintiffs had notice of this fact) on the one hand, and the time the instant action was begun. Lukens Steel Co. v. American Locomotive Co., 2 Cir., 1952, 197 F.2d 939, supports the view that as little delay as five years can be sufficient to establish the defense, and cites cases in which the defense was established on the basis of delays of six, nine, twelve, thirteen and sixteen years.

Plaintiffs argue that although no action was instituted, still the defendant was placed upon sufficient notice of the plaintiffs' claims that it was unjustified in going forward with the dryer development in disregard of the claims. There are two answers to this argument. First, cases like Shaffer v. Rector Well Equipment Co., 5 Cir., 1946, 155 F.2d 344; Rheinberger v. Security Life Ins. Co. of America, D.C.Ill.1943, 51 F.Supp. 188; Mattison-Greenlee Service Corp. v. Culhane, 7 Cir., 1939, 103 F.2d 608; and Rome Grader & Machinery Corp. v. J. D. Adams Mfg. Co., supra, all upon the issue of laches, introduce the concept of the defendant's reliance upon the plaintiff's acquiescence in its activities because of inaction, or of defendant's reason to believe that certain rights have been abandoned. This approach implies a knowledge by the defendant of the plaintiff's claims. In no other way is it possible for one party to presume that anything has been abandoned, except he knows of such claims in the first place. This consideration is conclusively decided in the Brennan case where it is established that the institution of suit is the sort of claim of right which will prevent laches. Second, the nature of the claims, if any, brought in fact to the attention of Hamilton could not adequately have informed Hamilton that claims were being made for the interests ultimately sued upon in the instant action. The principal claim allegedly asserted by plaintiffs Kohagen and Armonies (through her son Arthur) for instance, was purportedly made during a personal visit to the Hamilton plant in December 1938. The record establishes that at this meeting the only claims advanced by the said two plaintiffs amounted to Kohagen's claim that he was a co-owner of the patent in question, having been a co-inventor with Moore. Hamilton proceeded to investigate this claim, and ultimately concluded that there was nothing to it. Their conclusion in this regard was borne out in a Patent Office proceeding begun by Kohagen filing a sole application in the Patent Office on August 30, 1939. Kohagen's sole application resulted in an interference proceed-

ing in the Patent Office, because at that time Moore's sole application was already pending, and the two applications were for the same invention. Of the litigants in the instant action, only Kohagen and Moore were parties to the patent interference proceeding. This interference was concluded in 1944, and was made final in 1945. It determined that Kohagen was not an inventor of the patent in question. Moore, or his assignee, was subsequently issued the patent on the dryer.

In 1939 Kohagen instituted an action against Moore, and others, in a Minnesota State Court to avoid an abandonment of a patent application made jointly with Moore in 1935. This also supports the proposition that during 1939 to 1945 Kohagen was claiming to be a co-inventor of the dryer. The Minnesota action was concluded adversely to Kohagen in 1941.

Both the patent interference proceeding and the Minnesota state case support this court's finding that Kohagen's claim against Hamilton was only that he was a co-inventor up to the time the instant action was begun. Both these proceedings bore out Hamilton's evaluation of this claim (i. e. that Kohagen was not a co-inventor of the clothes dryer). At the conclusion of the Minnesota lawsuit and of the patent interference proceeding, the plaintiffs did not inform the Hamilton Company that they were not relying upon the claim that Kohagen was a co-inventor of the dryer, and that they were relying on the claim stated in the complaint until the instant action was instituted.

The time involved in the instant action is of such duration as to support a finding of laches. The deaths of Gowran and Clago, the unavailability of the Storm Co. records, the financial change of position of the defendant, and the obscurity of the relevant transactions in the memories of the various witnesses support a finding of laches. The inexcusability of the delay is established. Kohagen and Armonies knew of Hamilton's position in 1938; Callahan in 1939; Trucker in 1938 or 1939. The plaintiffs obviously knew of their alleged contractual rights at all times. This court will adhere to the general equitable principle that courts of equity will not afford relief to persons who have slept on their rights and who show no excuse for their laches in asserting them.

The prejudice caused by the unjustified delay of the plaintiffs in asserting their claims forces this court to conclude that the defendant will be forever prejudiced in the same way. If these plaintiffs should subsequently sue for damages alleged to have arisen after the instant action was commenced, the defendant would be in a position to assert this same defense successfully. The lost records, dimmed memories, deceased witnesses, and invested expenditures of the defendant are irretrievably lost. The defendant is prejudiced in that it will never be in a better position to defend an action upon the rights claimed in the instant action than it is now. The laches in this case extends to the assertion of the claimed rights, regardless whether those rights are asserted to recover damages that have arisen before or after June 10, 1949. The prejudice is such that it estops the plaintiffs forever from asserting the claims advanced in this case against this defendant.

For which foregoing reasons the court finds and adjudges that the plaintiffs are estopped by laches from asserting the claims in question, and orders that the complaint be dismissed.

Even if this court had not found the plaintiffs estopped by laches, the court is of the view that it would have to dismiss this action because indispensable parties are not before the court. In discussing the reasons for such a belief, the court will consider four questions which have a direct bearing on this matter.

First: What is the effect of failure to join indispensable parties with reference to jurisdiction?

Failure to join an indispensable party does not oust the jurisdiction of the court in the action before it. But

such failure does destroy the power of the court to grant any relief which would in any way affect an absent indispensable party. The distinction has been well explained in State of Washington v. U. S., 9 Cir., 1936, 87 F.2d 421, 427:

"In cases where there is error in nonjoinder of parties, either necessary or indispensable, the courts have fallen into common error by designating the error as 'jurisdictional.' The defect is not, properly speaking, a jurisdictional one as shown by the following quotation from Shields v. Barrow, supra, 17 How. 130, 141, 15 L.Ed. 158: 'As is observed by this court, in Mallow v. Hinde, 12 Wheat. (193) 198 (6 L.Ed. 599), when speaking of a case where an indispensable party was not before the court, "we do not put this case upon the ground of jurisdiction, but upon a much broader ground, which must equally apply to all courts of equity, whatever may be their structure as to jurisdiction; we put it on the ground that no court can adjudicate directly upon a person's right, without the party being either actually or constructively before the court." ' "

█ There is no dispute that where a plaintiff has failed to join an indispensable party, the court must dismiss the action. Such a defect may be raised either by the trial court or an appellate court. 3 Moore's Federal Practice § 19.-07. The defense of indispensability of parties was pleaded in the defendant Hamilton's answer, but even if this were not the case, this court could dismiss the action sua sponte. General Houses, Inc., v. R. F. C., D.C.Ill.1948, 81 F.Supp. 202.

Second: What is the test for indispensable parties?

In Roos v. Texas Co., 2 Cir., 1927, 23 F.2d 171, certiorari denied 277 U.S. 587, 48 S.Ct. 434, 72 L.Ed. 1001, parties were held indispensable because their rights were so entangled with one another that it was practically impossible in the decree to protest those that were absent.

The most practical test for indispensable parties is contained in State of Washington v. U. S., supra, wherein the court stated:

"There are many adjudicated cases in which expressions are made with respect to the tests used to determine whether an absent party is a necessary party or an indispensable party. From these authorities it appears that the absent party must be interested in the controversy. After first determining that such party is interested in the controversy, the court must make a determination of the following questions applied to the particular case: (1) Is the interest of the absent party distinct and severable? (2) In the absence of such party, can the court render justice between the parties before it? (3) Will the decree made, in the absence of such party, have no injurious effect on the interest of such absent party? (4) Will the final determination, in the absence of such party, be consistent with equity and good conscience?

"If, after the court determines that an absent party is interested in the controversy, it finds that all of the four questions outlined above are answered in the affirmative with respect to the absent party's interest, then such absent party is a necessary party. However, if any one of the four questions is answered in the negative, then the absent party is indispensable."

The tests laid out in the above case were recognized with approval by the Court of Appeals (7th) in Montfort v. Korte, 1939, 100 F.2d 615, 617, and Johnson v. Middleton, 1949, 175 F.2d 535, 538.

█ It should be noted that the determination of whether a party is indispensable in no way depends on the fact that a decree will not be res adjudicata as to him. In Brown v. Christman, 1942, 75 U.S.App.D.C. 203, 126 F.2d 625, 631, it was held:

"We note, also, the unexplained absence, as parties to this litigation,

of other property owners who are entitled, presumably, equally with appellants, to participate in any proper distribution of the disputed fund. If they are indispensable parties, it would be no sufficient answer that a decree entered in a case in which they were not parties, would not be res judicata as to them. The facts which would be presented by these additional property owners might vary from the facts presented here. A disposition of the funds, made without giving them an opportunity to establish their claims, might be seriously prejudicial to their interests."

And in Green v. Brophy, App.D.C.1940, 110 F.2d 539, 541, it was stated:

"It is important to note that whether a party is indispensable depends on something other than the effect of a decree as res adjudicata upon him. Of necessity that must be so, else absent parties would never be indispensable."

Third: Have the plaintiffs failed to join indispensable parties?

■ At the trial on the issue of laches, no direct testimony was had regarding indispensability of parties. Nor did the court call for argument on indispensability due to the fact that the issue came to its attention after the completion of the trial. Nevertheless, the evidence received by the court shows the following: That Hamilton contracted to pay royalties to Stanley Harwood (Def.'s Exh. 206); that Harwood assigned a one-half interest to Moore (Pl.'s Exh. 391A); that Moore and Harwood informed Hamilton in writing that the firm of Leonard, Street & Deinard were partial assignees (Pl.'s Exh. 407). Whether or not there have been other assignments was not established affirmatively. But, in any case, those parties who are at present receiving royalties are not before the court.

There can be no doubt that Moore, Harwood and the firm of Leonard, Street & Deinard, or their nominees or assignees, hereinafter referred to as the "Harwood group" are interested in this controversy. The right to royalties arises out of the patent monopoly. The determination of who owns what percentages of the royalty rights under Moore's patents necessarily interests the Harwood group since that group has been receiving all royalties paid by Hamilton.

The four questions proposed by the Washington case should now be answered:

1. Is the interest of the absent party distinct and severable? That question must be answered in the negative. The plaintiffs and the Harwood group claim parts of the same royalties which are, in fact, a fund; their respective rights arise under the same monopoly grants; both groups claim their rights from the same inventor, Moore. In the words of Mallow v. Hinde, 1827, 12 Wheat. 193, 196, 25 U.S. 193, 196, 6 L.Ed. 599:

"In this case, the complainants have no rights separable from, and independent of, the rights of persons not made parties. The rights of those not before the court lie at the very foundation of the claim of right by the plaintiffs, and a final decision cannot be made between the parties litigant, without directly affecting and prejudicing the rights of others, not made parties."

2. In the absence of such party, can the court render justice between the parties before it? It appears that the answer to this question may be in the affirmative.

3. Will the decree, made in the absence of such party, have no injurious effect on the interest of such absent party? This question must be answered in the negative. A decision in favor of the plaintiffs could cut off 65% of the royalties the Harwood group is receiving at the present time. It would also cast grave doubt on the Harwood group's right to all of the royalties even though the Harwood group would not be bound by this court's decree.

4. Will the final determination, in the absence of such party, be consistent with equity and good conscience? Another way of expressing this question is whether a decree made without such a party will leave the controversy in such a condition that its final solution calls for further litigation. A decree in favor of the plaintiffs could cut off 65% of the royalties now being received by the Harwood group. It does not seem equitable to proceed in such a manner when the Harwood group has not had its day in court. Such a decree would, or could, lead to litigation on the part of the Harwood group to compel Hamilton to pay the Harwood group the full amount of the royalties; or, possibly, the Harwood group might sue the plaintiffs for a determination of their respective rights. In any case, a decree of this court could not finally settle the overall controversy between Harwood and the plaintiffs.

Moreover, if Hamilton were ordered to pay a percentage of the royalties to the plaintiffs, this court would, in effect, command Hamilton to breach its contract with the Harwood group. This result seems inequitable. In a suit between the Harwood group and Hamilton, another court of equity would be faced with the prospect of enjoining Hamilton from paying any royalties to the plaintiffs herein. Hamilton might well be caught in a cross fire of injunctions, and another court of equity might feel that this court had tied its hands by entering a decree as to the plaintiffs and Hamilton.

Applying the tests set forth in the Washington decision, this court would have to find that all members of the Harwood group are indispensable parties since three of the above questions have been answered in the negative. As the court stated in the Washington case [87 F.2d 428]:

"However, if any one of the four questions is answered in the negative, then the absent party is indispensable."

This controversy seems to be essentially an action to determine ownership of rights and conflicting claims to a fund,

namely, royalties paid by Hamilton. It was stated in Johnson v. Middleton, supra [175 F.2d 537]:

"Of course all persons having conflicting claims to a particular fund are indispensable parties to its disposition." Accord, Cyc.Fed.Proc. § 21.98; 3 Moore's Federal Procedure, § 19.08.

The reasoning in Bank of California Nat. Ass'n v. Superior Court, 1940, 16 Cal.2d 516, 106 P.2d 879, 883, seems persuasive:

"First, then, what parties are indispensable? There may be some persons whose interests, rights, or duties will inevitably be affected by any decree which can be rendered in the action. Typical are the situations where a number of persons have undetermined interests in the same property, or in a particular trust fund, and one of them seeks, in an action, to recover the whole, to fix his share, or to recover a portion claimed by him. The other persons with similar interests are indispensable parties. The reason is that a judgment in favor of one claimant for part of the property or fund would necessarily determine the amount or extent which remains available to the others. Hence, any judgment in the action would inevitably affect their rights. Thus, in an action by one creditor against assignees for the benefit of creditors, seeking an accounting and payment of his share of the assets, the other creditors were held indispensable [citation]; and in an action by plaintiff to enforce a trust, where he claimed the property in his own right, to the exclusion of another actual beneficiary, failure to join the latter was held fatal to the judgment."

The burden is on the plaintiffs to join all of the Harwood group as defendants in this action. National City Bank of New York v. Harbin Electric Joint-Stock Co., 9 Cir., 1928, 28 F.2d

468, 61 A.L.R. 961. If the plaintiffs fail to do so, this court will be powerless to grant any relief to them.

Fourth: Is the jurisdiction of this court destroyed by lack of diversity?

If the plaintiffs do join the indispensable parties heretofore mentioned (assuming that service could be effected on all of them), the jurisdiction of this court may be destroyed. Some courts have held that if an indispensable party has not been joined and if such joinder would destroy diversity of citizenship, then the court should dismiss the action for lack of jurisdiction. Dempsey v. D. B. & M. Oil & Gas Co., 6 Cir., 1955, 219 F.2d 808; Young v. Garrett, D.C.Ark.1943, 3 F.R.D. 193. But the better view is expressed in Hudson v. Newell, 5 Cir., 1949, 172 F.2d 848, 850, wherein the court held:

> "(2) A court cannot adjudicate the rights of persons who are not parties before it; they will be brought in if possible and if they will not destroy diversity. (3) If diversity will be thereby destroyed the court will not require them to be brought in, but will inquire if there is any relief it can properly give without them; if there is, it will give it without prejudice to the rights of the absent; if none can be given the suit will be dismissed. In the latter event the dismissal is not for want of federal jurisdiction, but for lack of indispensable parties."

This court would have to dismiss this action for failure to join indispensable parties were it not for the fact that the finding of laches disposes of this controversy. The court, however, wished to express its view so that in the event of an appeal on the question of laches, the Court of Appeals would be apprised of the court's opinion that indispensable parties have not been joined in this action.

Counsel for the defendant is directed to prepare findings of fact and conclusions of law in accord with this opinion and submit them to plaintiffs' counsel for approval as to form only.