THE JOINT STOCK SOCIETY, "Trade House of Descendants of Peter Smirnoff, Official Purveyor to the Imperial Court," and the Russian American Spirits Company, Plaintiffs,

v.

UDV NORTH AMERICA, INC., and Pierre Smirnoff Company, Defendants.

Civil Action No. 95–749–GMS.

United States District Court, D. Delaware.

May 24, 1999.

M. Duncan Grant, Tara L. Lattomous,
Pepper Hamilton LLP, Wilmington, DE,
James W. Hawkins, Hillary Harp, Carrie

A. Hanlon, Powell, Goldstein, Frazer & Murphy LLP, of counsel, Atlanta, GA, for plaintiff.

Allen M. Terrell, Jr., Srinivas M. Raju, Richards, Layton & Finger, Wilmington, DE, William L. Webber, Kenneth W. Brothers, Charles A. Loughlin, Erik J. Berlin, Therese K. Francese, Kelly A. Clement, Timothy E. Boyle, Howrey & Simon, Washington, DC, of counsel, for Defendants.

### AMENDED OPINION

SLEET, District Judge.

## I. INTRODUCTION.

The plaintiffs in this action, the Joint Stock Society and the Russian American Spirits Company ("RASCO"), have sued the defendants, UDV North America, Inc. and the Pierre Smirnoff Company, for false advertising, false association, and trademark cancellation. According to the plaintiffs, the defendants have violated several provisions of the Lanham Act, 15 U.S.C. § 1051 *et seq.* (1994), as well as two state laws prohibiting unfair competition, *see* Del.Code Ann. tit. 6, §§ 2531–36 (1993), by knowingly engaging in over fifty years worth of false advertising and trademark misuse concerning their SMIRNOFF vodka products. This court has jurisdiction over the Lanham Act and state law claims pursuant to 28 U.S.C. §§ 1331, 1338, and 1367, respectively.

Between April 28, 1998 and August 20, 1998, the defendants filed a series of motions for summary judgment. Because the court is convinced by some of the arguments raised in the defendants' case dispositive motions as well as by the responses to some of the questions the court posed to the parties at the hearing on these motions, summary judgment will be granted in favor of the defendants on all counts of the complaint.

The reasons for the court's decision are three-fold. First, the plaintiffs have not taken sufficient preparatory steps to enter the U.S. market and, as a result, have failed to satisfy the Article III case or controversy requirement imposed by the United States Constitution. Second, even if the plaintiffs could establish facts or articulate a theory demonstrating that this matter constitutes a justiciable case or controversy, the plaintiffs do not have standing to bring these particular claims. Third, and finally, even if the plaintiffs were able to satisfy the constitutional and prudential standing requirements under the relevant statutes, their legal action would be barred as a result of their years of inaction under the doctrine of laches. For these reasons, the court will grant summary judgment in favor of the defendants.

## II. SUMMARY JUDGMENT STANDARD.

The court can grant summary judgment only if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c) (1998); *see also Berner Intn'l Corp. v. Mars Sales Co.*, 987 F.2d 975, 978 (3d Cir.1993) (citing the rule); *Lucent Info. Mgmt. v. Lucent Technologies, Inc.*, 986 F.Supp. 253, 257 (1997) (same). An issue is "genuine" if, given the evidence, a "reasonable jury could return a verdict in favor of the nonmoving party." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" if it might affect the outcome of the case. *See ACCU Personnel, Inc. v. AccuStaff, Inc.*, 846 F.Supp. 1191, 1203 (D.Del.1994) (citing *Anderson*, 447 U.S. at 248, 100 S.Ct. 2124).

On summary judgment, the court must refrain from "weigh[ing] the evidence and determin[ing] the truth of the matter" asserted. *See Anderson*, 477 U.S. at 249, 106 S.Ct. 2505. Instead, the court should only determine whether there is a genuine issue for trial. *See Berner*, 987 F.2d at 978 (citing *Anderson*, 447 U.S. at 250, 100 S.Ct. 2124).

In making this determination, the court must refrain from determining the credi-

bility of witnesses or their testimony. *See Country Floors, Inc. v. A Partnership Composed of Charley Gepner and Gary Ford,* 930 F.2d 1056, 1061 (3d Cir.1991). In addition, the court must draw all inferences and resolve all doubts in favor of the nonmoving party—here, the plaintiffs. *See Iberia Foods Corp. v. Romeo,* 150 F.3d 298, 302 (3d Cir.1998); *see also ACCU Personnel,* 846 F.Supp. at 1204. In other words, on the defendants' motions for summary judgment, the court must view the evidence in the light most favorable to the plaintiffs. *See Berner,* 987 F.2d at 978; *Lucent,* 986 F.Supp. at 257.

With these legal principles in mind, the court turns to a recitation of the facts giving rise to this lawsuit.

## III. BACKGROUND.

As stated in an earlier opinion, "[a]n understanding of the plaintiffs' claims requires a brief lesson on Russian history." *See Joint Stock Soc'y v. Heublein, Inc.,* 936 F.Supp. 177, 182 (D.Del.1996). Consequently, the court now embarks upon a journey which covers over 130 years worth of world events.[1]

### A. The Rise And Fall Of The Original Smirnov Trade House.

Sometime around 1860, a man named Piotr Arsenyevitch Smirnov founded a Russian trade house called "P.A. Smirnov in Moscow." This trade house distilled and sold vodka in addition to a number of other spirits. Beginning in 1873, Smirnov's vodka started to win a number of prestigious national and international awards,[2] culminating in his being named the "Official Purveyor to the Russian Imperial Court" in 1886.

In 1898, Smirnov died, leaving the trade house to his widow and five sons. Four years later, in 1902, the three oldest sons bought out the interests of their two younger brothers—Sergei and Alexey—to form the company "Piotr, Nikolai, and Vladimir Smirnov Trading under the name P.A. Smirnov, Moscow." This new partnership, however, did not last long. Between 1904 and 1905, both Vladimir and Nikolai sold their interest in the company to Piotr. Pursuant to the most relevant agreement, Vladimir relinquished his "right to the company name, privileges, and honors" in exchange for 500,000 Rubles or, roughly, $250,000 in 1904 dollars.

As sole owner of the trade house, Piotr soon enlisted the aid of his wife, Eugenia, to help him run the enterprise. With Piotr's passing in 1910, Eugenia became the trade house's sole owner, running its operations until 1917, the year of the Bolshevik revolution, when she married an Italian diplomat and fled the country.

In the wake of the Russian revolution, the new government passed laws abolishing private property. As a consequence, the government nationalized the trade house, taking over its operations in 1918. While the facilities were still used to make vodka, it was no longer produced under the SMIRNOV name. Instead, it bore the name of a company created, owned, and run by the Soviet State.

### B. Evidence Of U.S. Sales.

Although there is no direct evidence that any SMIRNOV products were actually purchased in the United States prior to 1918, it appears as if a small quantity of SMIRNOV products were shipped to the U.S. between 1907 and 1914. Specifically, according to a limited series of advertisements or articles concerning SMIRNOV products that appeared in *Bonfort's Wine*

---

1. Although the defendants intend to dispute several of the following factual assertions at trial, they have essentially conceded them for the purposes of their motions. As a result, the court takes these facts as true for the purposes of this opinion.

2. For example, in 1876, Smirnov won the Highest Medal of Honor at the International Exhibition in Philadelphia, Pennsylvania. And, in 1878, he won two Gold Medals at the World's Fair in Paris, France.

*and Spirits Circular* around this time, the J.B. Martin Importation Company of New York, New York was the "sole agent in the United States" for distributing SMIRNOV products. In 1907, roughly 50 cases of SMIRNOV cordials were shipped to J.B. Martin in New York. Finally, prior to 1914, at least two retailers in New York City, one of them apparently being MACY's, had carried SMIRNOV products for sale.

Thus, despite the lack of direct evidence showing that American consumers actually bought these SMIRNOV products, it is probably reasonable to infer that some of the bottles that were imported into the country were indeed purchased by the American buying public—especially when the limited evidence available is viewed in the light most favorable to the plaintiffs.

However, as the parties agree, it is probably fair to say that no SMIRNOV products were being shipped to the U.S. after 1918 since the trade house was taken over by the Soviet State that year. Moreover, with the advent of Prohibition in 1920, it is also fair to say that if there were any SMIRNOV products remaining in the United States, they were probably bought and sold, if at all, only surreptitiously and, thus, in even more limited quantities than before 1918, when it was apparently offered for sale at select New York City locations.

Finally, there is no evidence that the original trade house ever formally filed any trademark registrations with the U.S. Patent and Trademark Office prior to the company's closing in 1918.

C. The Rise Of A New Smirnoff Company.

Around 1920, after fleeing Russia, Eugenia settled in a Russian émigré community located in Nice, France. Around this time, the Soviet State began to refine its laws concerning the ownership of private property. Most relevant to this lawsuit, the communist regime adopted a harsh criminal code that prohibited, among other things, private capital enterprise under severe penalty since it was deemed counter-revolutionary or insurrectionist.

In the face of these laws, Vladimir—who had signed away his rights to the family business in 1904—also fled the country. By 1923, he had settled in Lvov, Poland where he established "Ste. Pierre Smirnoff Fls.," which loosely translated means the "Company of the Sons of Piotr Smirnov." Like its predecessor and namesake, Vladimir's company was formed for the purposes of making and distilling alcoholic beverages, including vodka products. In fact, during this time, Vladimir held out his company as the "Successor to P.A. Smirnoff in Moscow and PN & V Smirnoff." In an attempt to further profit from this asserted association, the new Smirnoff company sold its vodka in bottles with labels that bore an uncanny similarity to the one employed by the original trade house. Most relevant, the labels on these bottles depicted various emblems, medals, coats of arms, and awards earned by and associated with the original trade house. As an apparent result, the new Smirnoff company became so successful that, by 1925, it had established a facility in Paris, France.

Shortly thereafter, Eugenia learned of her brother-in-law's operation. She became "furious" since she believed that Vladimir had no right to use the SMIRNOFF name. In fact, in 1926, she wrote to her husband, the diplomat, to inquire about her options. Apparently, he informed her that in order to commence legal action, she would need to have documentary proof that the original trade house belonged to her. However, all of the papers which established that she was the sole owner of the original trade house were still located in the Soviet Union—which, as mentioned earlier, had just begun to pass laws prohibiting free enterprise. Fearing prosecution under the Soviet criminal code, Eugenia elected to stay in France, suspecting that a return to the former Russia might land her in prison.

Nevertheless, over the next thirty years, Eugenia did write letters to various friends and relatives still living in the Soviet Union, asking them for help. Specifically, she asked for their assistance in securing documentation that might support her claim of ownership of the original trade house and, thus, its name. Eugenia even enlisted the help of her daughter, Tatyana, to also write letters to various individuals and organizations, including the Red Cross, to ask for similar help. In fact, Tatyana even traveled to Paris once to complain to the Chamber of Commerce about Vladimir's company. However, there is no evidence that any formal letter of complaint was ever filed with this entity.

At this point, it is important to note that although Eugenia and Tatyana were writing letters to a number of individuals as well as both private and public organizations, neither one of them ever once contacted Vladimir to either voice their concerns about or express their displeasure with his activity. As the plaintiffs themselves admit, both of these women "had no desire to talk" with Vladimir because they considered him to be "a pariah, a cheat, and a crook." According to the plaintiffs, given Vladimir's unscrupulous nature, both Eugenia and Tatyana believed that, without a set of records demonstrating who was the true owner of the original trade house, they were powerless to do anything about his actions.

In 1933, one year before Vladimir's death, his company, Ste. Pierre Smirnoff Fls., entered into a written agreement with Rudolph Kunnett, an American businessman who was also a Russian émigré. The 1933 agreement purportedly gave Kunnett the exclusive right to produce and sell alcoholic beverages under the SMIRNOFF name in North America.[3] Specifi-

cally, the agreement stated that Kunnett would receive

> the exclusive right and license to manufacture and sell ... all the alcoholic beverages and other products of the firm [Ste. Pierre Smirnoff Fls.], together with the trademarks and labels as used and owned by the firm, and the exclusive right to reproduce and use the various models of bottles ... in use by the firm or its licensee in France.

The 1933 agreement also afforded Kunnett the "exclusive right to use the subtitles 'Firm of Pierre Smirnoff, formerly by appointment to the Imperial Court of Russia' and 'Firm of Pierre Smirnoff, founded in Moscow in 1818.'" In addition, the agreement granted Kunnett the "exclusive right to reproduce and use ... various emblems, medals, coats of arms, insignia, and awards," which appeared in a color catalog published by the original trade house in 1912. In particular, these emblems, medals, coats of arms, insignia, and awards included (1) the family crest in a crown, shield, and shroud design as well as (2) three double-headed eagles and the emblem of the Russian empire, which represented the four times that the original trade house won Russia's highest honor. Finally, the agreement gave Kunnett the "exclusive right and power to apply to the patent office in Washington, D.C. [either] in his own name or in the name of the firm [Ste. Pierre Smirnoff Fls.] ... for the registration of the firm's name, trademark, labels, emblems, medals, coats of arms, or other insignia or awards as well as for the registrations of the [previously mentioned] subtitles."

That same year, Kunnett conveyed his rights under the agreement to a New York corporation that he had recently formed, called "Ste. Pierre Smirnoff Fls., Inc." One year later, in 1934, the year that Prohibi-

---

**3.** The plaintiffs contend that this agreement conveyed no rights whatsoever since, pursuant to the 1904 agreement, Vladimir had no rights in the SMIRNOFF name to convey. For the purposes of their motions, the defendants are willing to concede this point.

However, the defendants are not willing to concede that Kunnett was aware that Vladimir had no rights to convey—another contention made by the plaintiffs. The court will discuss this issue more fully later on in its opinion.

tion was repealed, Kunnett's company began its exclusive use of the SMIRNOFF name and the various trademarks associated with it in the United States. Like Vladimir, Kunnett sold his SMIRNOFF vodka in bottles which (1) were essentially the same shape as those used by the original trade house and (2) bore labels that contained essentially all of the same marks and other forms of trade dress which adorned the bottles made by the original trade house. Most relevant to this lawsuit, Kunnett's label displayed the four coats of arms that symbolized the four times that the original trade house had won Russia's highest honor beneath a crown and bunting design and above a banner that read "Purveyors to the Imperial Russian Court, 1886—1917."

The following year, Kunnett's company obtained three SMIRNOFF trademark registrations from the U.S. Patent and Trademark Office for various vodka products. In general, these trademark registrations were based on the SMIRNOFF name, emblems, medals, coats of arms, insignia, and awards which were referred to in the 1933 agreement and adorned the bottles of SMIRNOFF vodka sold by his company.

At some point in time during the 1930s, Eugenia and her family became aware that Vladimir had sold his "rights" to the SMIRNOFF name to Kunnett. Eugenia also became aware that Kunnett was making and selling alcoholic beverages under the SMIRNOFF name in the United States, using several of the emblems, medals, coats of arms, insignia, and awards once associated with the original trade house. However, just as they never contacted Vladimir to voice their displeasure with his activities, neither Eugenia nor Tatyana ever notified Kunnett to assert or, for that matter, explain their claim to the SMIRNOFF name.

In 1939, a company called G.F. Heublein & Brothers, now UDV North America, bought Ste. Pierre Smirnoff Fls. from Kunnett. The sale expressly included the trademarks, trademark registrations, and rights under the 1933 agreement that Kunnett had entered into with Vladimir's company. Heublein then established a Connecticut subsidiary, also named Ste. Pierre Smirnoff Fls., Inc., to take over the manufacture and sale of SMIRNOFF vodka in the United States.

Over the next twenty years, Heublein invested heavily in advertising, marketing, and promoting products under the SMIRNOFF name. In addition, Heublein continued to apply for new trademark registrations for its SMIRNOFF products, while renewing the original three SMIRNOFF trademarks that Kunnett had obtained. Like Vladimir and Kunnett, Heublein sold its SMIRNOFF vodka in bottles that essentially bore the same crown and bunting design above the same four coats of arms and the same banner which read "Purveyor's to the Imperial Russian Court, 1886—1917."

All the while, neither Eugenia nor Tatyana ever once informed the company of either their displeasure with its use of the SMIRNOFF name or the associated marks. Furthermore, even though they both knew that Heublein was selling alcoholic beverages in the United States under the SMIRNOFF name, they never once informed the company that they intended to file suit or assert, in any other matter, any rights that they claimed.

Then, in 1958, just before Eugenia died, she signed a document which gave her daughter Tatyana "power of attorney" over, among other things, the "defense of [her] interest in asserting [her] rights to the ownership and title of 'SMIRNOFF VODKA' ... which [she believed had] been unjustly used by third parties in violation of her rights." However, in her lifetime, Tatyana neither brought suit against Heublein nor contacted the company to dispute its right to use the SMIRNOFF name or associated marks in connection to the sale of vodka in the United States. In fact, at the time of her death in

1977, Tatyana had yet to send one letter of complaint to Heublein or, for that matter, correspond with the company in any other way.[1] And, for the eighteen years that followed, Tatyana's son, Boris Alexandrovitch, also failed to take any action of any kind against Heublein.

In fact, it was not until 1994 when Boris finally took affirmative steps toward vindicating any right that he might have to the SMIRNOFF name. According to the plaintiffs, Boris read a newspaper article in *Le Figaro* that year which recounted how several other Smirnov descendants had formed their own trade house over in Russia and were involved in a legal battle with Heublein over who had the right to sell vodka under the SMIRNOFF or SMIRNOV name in Russia. Armed with the knowledge that some of his relatives over in Russia were attempting to assert legal claims against Heublein, Boris joined in the fray by traveling to Moscow, finding his relatives at the modern trade house, discussing his business interests with them, obtaining shares in the new company, and authorizing it to sue Heublein to vindicate whatever rights he might have to the family name.

As might be expected, in the forty years that followed Eugenia's death, Heublein dramatically increased its expenditures on advertising, marketing, and promoting its SMIRNOFF products in the United States, spending millions if not tens of millions of dollars on the line annually. As a result, somewhere between five to six million cases of SMIRNOFF vodka are presently sold in the U.S. each year, making it the most popular brand of vodka and the second most popular distilled spirit in the United States. It is still sold in bottles with labels that continue to bear an striking similarity to the ones used by the original trade house. Specifically, these labels, like the ones designed by Vladimir and Kunnett, display essentially the same crown and bunting design above the four Russian coats of arms and a banner reading "Purveyors to the Imperial Russian Court, 1886—1917." Finally, the bottles, their labels, and thus the SMIRNOFF name and associated marks have all, over the years, figured prominently in Heublein's advertising of its SMIRNOFF line.

### D. The Parties To The Present Action.

Despite the rich history previously recounted by the court, the plaintiffs in the case at bar have no direct connection to Eugenia, Tatyana, or Boris—*i.e.*, the French Smirnoffs. Instead, as the court will soon discuss, the plaintiffs are two recently-formed corporations that express a desire to enter the U.S. market to sell their vodka under the SMIRNOV name.

#### 1. The plaintiffs.

Formed in the wake of Peristroika, the Joint Stock Society was chartered in 1993 under the laws of the Russian Federation. Its principal owners are Andrei and Boris Alexeseevitch Smirnoff,[5] who claim to be descendants of Smirnov's two youngest sons—Sergei and Alexey. Beginning in 1994, the Society began contracting with Russian vodka manufacturers to produce and sell vodka under the Cyrillic letters CMHPHOBb, which roughly translates into SMIRNOV.[6] This vodka is presently

---

4. Two years after Tatyana died, Kunnett passed away. By the time of his death, he had served as not only the president of both his and Heublein's Smirnoff companies but also the vice president of Heublein itself. In addition, in 1986, John Martin, another prominent Heublein executive who was also a party to the original purchase of the rights to the SMIRNOFF name from Kunnett in 1939, passed away.

5. Since Boris Alexeseevitch Smirnoff plays no role in the court's subsequent analysis, any mention of "Boris" in this opinion refers to Boris Alexandrovitch Smirnoff, who was Tatyana's son and Eugenia's grandson.

6. As the parties concede, there is no material difference between the SMIRNOFF and SMIRNOV names. However, in order to differentiate between the parties and their respective products, the court will use the name SMIRNOV when referring to the plaintiffs'

being offered for sale only in Russia. It has never been exported to or sold in the United States. In fact, at present, no commercial vodka product associated with the Society has ever been sold or, for that matter, offered for sale in the United States.

Formed in 1995, RASCO is a Delaware corporation, with its headquarters in the State of Connecticut. The company is the Society's exclusive licensee for any rights it might have in the SMIRNOFF or SMIRNOV trademark and trade name. RASCO's rights and obligations under this agreement, however, are expressly contingent on a favorable resolution of this lawsuit. Like its licensor, RASCO has never sold or attempted to sell any vodka product, or any other product, in the United States.

Neither the Society nor RASCO has ever attempted to commercially import, sell, distribute, market, advertise, or produce any product, vodka or otherwise, in the United States. Presently, they have no business plan or marketing campaign to govern the sale of their Russian vodka in the United States. They also have never undertaken any advertising of their products in the United States. Furthermore, neither one of these companies has ever entered into any agreement with any company in the United States concerning the distribution of their Russian vodka here. Finally, neither the Society nor RASCO has ever attempted to obtain any federal, state, or local government licenses or permits relating to the production, distribution, or sale of their vodka or any other alcoholic beverage. In short, both the Society and RASCO are completely absent from the U.S. market, waiting (as they themselves admit) to see whether they will prevail in this lawsuit.

Essentially, these plaintiffs have filed suit in an attempt to win the exclusive right to use the SMIRNOV name in connection with the anticipated sale of their vodka products here. Specifically, the plaintiffs seek to cancel of the existing SMIRNOFF trademarks obtained by the defendants over the last sixty years as well as to enjoin the defendants from any use of the SMIRNOFF name in the future.

The plaintiffs, however, also seek to recover damages from the defendants for their allegedly wrongful use of the SMIRNOFF name. On this point, the plaintiffs essentially advance three theories. First, in addition to punitive and treble damages, they request the disgorgement of all of the defendants' profits from 1982 to the present. While an exact calculation of these profits would require an accounting, they can be estimated at roughly $1 billion. Second, they seek a reasonable royalty from the defendants to recover for their use of the SMIRNOFF name from 1939 to the present, an amount which the plaintiffs calculate at approximately two percent of the defendants' gross sales to date or approximately $300 million—*i.e.*, roughly ten percent of the defendants' historical profits. Third and finally, the plaintiffs desire somewhere between $20 to $125 million to fund an advertising campaign to correct any consumer misperception about the origin of SMIRNOFF vodka or its true maker.

## 2. The defendants.

Although it has gone through a series of name changes, UDV North America has manufactured, sold, distributed, and marketed vodka under the SMIRNOFF name, both in the United States and throughout the world, since 1939. As previously discussed, its vodka is sold in bottles with labels that bear a marked resemblance to the ones used by the original trade house. Within the last few years, UDV has commenced a number of legal or administrative proceedings against the Society in other foreign jurisdictions,[7] seeking to protect its use of the SMIRNOFF name.

The Pierre Smirnoff Company is a Delaware corporation, with its headquarters in

products and SMIRNOFF when referring to those made by the defendants.

7. Although the defendants point out that the plaintiffs have not cited to any evidence in the

London, England. The company is a wholly-owned subsidiary of UDV North America and is responsible for coordinating the worldwide marketing strategy for the SMIRNOFF brand.

As stated earlier, as a result of the investment that these two companies have made in their product, SMIRNOFF vodka is now the most popular brand of vodka and the second most popular distilled spirit in the United States, selling somewhere between five to six million cases annually and generating roughly $300 million in gross sales each year.

With these facts in mind, the court turns to a discussion of the governing law.

## IV. DISCUSSION.

After reviewing the voluminous record before it, the court has decided that granting summary judgment in favor of the defendants is appropriate for three reasons. First, by failing to take adequate precatory steps to enter the U.S. market, the plaintiffs have not presented this court with a justiciable case or controversy. Second, because of their absence from the marketplace, the plaintiffs also lack standing to bring the particular Lanham Act and state law claims they seek to assert. Third, and finally, even if the plaintiffs were able to satisfy the constitutional and prudential standing requirements under the relevant statutes, their action is barred by doctrine of laches as a result of the extraordinary amount of time it has taken them to bring this suit and the extreme prejudice this delay has caused the defendants. The court will now address these issues *seriatim.*

A. The Plaintiffs Have Failed To Establish The Existence Of An Article III Case Or Controversy That Is Ripe For Decision.

■ Pursuant to Article III of the United States Constitution, this court can only exercise jurisdiction over cases or controversies arising under the laws of the United States. *See* U.S. Const. art. III, § 2. The Constitution imposes this requirement in order to prevent the federal judiciary from impermissibly expanding the scope of its mandate through the issuance of advisory opinions on hypothetical or abstract issues. *See Flast v. Cohen,* 392 U.S. 83, 95–97, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). To qualify as a legitimate case or controversy, a lawsuit "must be definite and concrete, touching on the legal relations of parties having adverse legal interests." *See Aetna Life Ins. Co. of Hartford v. Haworth,* 300 U.S. 227, 240, 57 S.Ct. 461, 81 L.Ed. 617 (1937). In other words, there must be an *actual dispute* between *adverse litigants* concerning an issue where there is a *substantial likelihood* that a decision by a federal court on the matter will bring about some sort of desired change or effect. *See* Erwin Chemerinsky, *Federal Jurisdiction* 48–50 (2d ed.1994); *see also United States Nat'l Bank of Oregon v. Independent Ins. Agents of America, Inc.,* 508 U.S. 439, 446, 113 S.Ct. 2173, 124 L.Ed.2d 402 (1993) (noting that the suit must pursue "an honest and actual antagonistic assertion of rights by one [party] against another" and that these "valuable legal rights ... [would] be directly affected to a specific and substantial degree" by a decision on the matter by a federal court) (quoting *See Muskrat v. United States,* 219 U.S. 346, 359, 31 S.Ct. 250, 55 L.Ed. 246 (1911); *Nashville, Chattanooga & St. Louis Railway Co. v. Wallace,* 288 U.S. 249, 262, 53 S.Ct. 345, 77 L.Ed. 730 (1933)).

In this case, the plaintiffs contend that they commenced this legal action against the defendants because they feared that they might be sued if they first attempted to sell their SMIRNOV vodka products in the United States. In other words, the

---

record to support this statement, the court notes that both parties agree that, at a minimum, the defendants did initiate legal proceedings against the plaintiffs in Russia when the Society began to offer its vodka for sale there under the SMIRNOV name.

plaintiffs claim that, at the time they filed this lawsuit, they believed that if they had offered their goods for sale in the U.S., they would have been immediately sued for trademark infringement by the defendants, who make and sell SMIRNOFF vodka here. To support their contentions, the plaintiffs point to the various other legal actions the defendants have filed against them in at least fifteen other countries in addition to the Russian republic.

Thus, in order to determine whether this lawsuit presents an actual or live case or controversy, the court must first examine whether the plaintiffs' fears or beliefs are merely "imaginary, illusory, speculative, or fabricated entirely in the plaintiffs' mind" or whether the "threat [of suit] is immediate or real in any perceptible way." *See United Sweetener USA, Inc. v. Nutrasweet Co.,* 760 F.Supp. 400, 407 (D.Del.1991); *see also Mobil Oil Corp. v. Advanced Environmental Recycling Technologies, Inc.,* 826 F.Supp. 112, 114 (D.Del.1993) (requiring an "objectively reasonable apprehension" of suit); *Akzona, Inc. v. E.I. du Pont de Nemours & Co.,* 662 F.Supp. 603, 610 (D.Del.1987) (noting that the plaintiff must show not only a "reasonable apprehension" of suit but also a "concrete" claim rather than one which is "academic") (quoting *Enka B.V. of Arnhem, Holland v. E.I. du Pont De Nemours & Co.,* 519 F.Supp. 356, 361 (D.Del.1981)).[8]

■ However, an examination of the plaintiffs' fears or beliefs only begins the inquiry. In addition, the court must also explore whether the plaintiffs have evinced an immediate intent and ability to commence the allegedly infringing activity by taking sufficient precatory steps to enter the U.S. market. *See Starter,* 84 F.3d at 596. Because the court finds that the plaintiffs have not meaningfully or adequately prepared to begin selling their SMIRNOV vodka products in the United States, it concludes that they have failed to present a justiciable case or controversy which is ripe for decision.

1. Since the plaintiffs have not taken adequate steps to enter the U.S. market, they fail to satisfy the "actual controversy" requirement under the Declaratory Judgment Act. As a result, they cannot satisfy the "case or controversy" requirement to maintain their claims under the Lanham Act.

■ In order to maintain a claim for trademark infringement under the Declaratory Judgment Act, a plaintiff must show that (1) the defendant's conduct has created a "real and reasonable apprehension of liability" on the part of the plaintiff and (2) the plaintiff has engaged in a "course of conduct which has brought it into adversarial conflict with the defendant." *See Starter,* 84 F.3d at 595 (citing *Windsurfing Intn'l, Inc. v. AMF, Inc.,* 828 F.2d 755, 757–58 (Fed.Cir.1987)); *see also G. Heileman Brewing Co., Inc. v. Anheuser-Busch, Inc.,* 873 F.2d 985, 990 (7th Cir. 1989) (requiring a "reasonable apprehension" of suit and an immediate ability to produce the product and, then, enter the

---

**8.** Although all four of these cases involved actions for patent infringement, the court can properly look to them for guidance given the similarities between patent and trademark law on this issue. *See* 10B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 2761, at 597 (1998); *see also Starter Corp. v. Converse, Inc.,* 84 F.3d 592, 596 (2d Cir.1996) ("Declaratory judgment actions involving trademarks are analogous to those involving patents, and principles applicable to declaratory judgment actions involving patents are generally applicable to those involving trademarks.") (citations omitted).

In fact, because the Declaratory Judgment Act, 28 U.S.C. § 2201 (1994), imposes an "actual controversy" requirement which is virtually identical to the "case or controversy" requirement under Article III, *see EMC Corp. v. Norand Corp.,* 89 F.3d 807, 810 (Fed. Cir.1996), the court may also look to cases which rely on Section 2201 as the basis for their decision for guidance.

However, it is important to note that the plaintiffs have not actually asserted a specific claim under the Declaratory Judgment Act in their complaint. In fact, by their own admission, the plaintiffs "are not seeking a declaratory judgment."

marketplace). Even though the court finds that the plaintiffs have introduced sufficient evidence to support their claim that they reasonably believed that they would be sued by the defendants if they attempted to sell their SMIRNOV vodka products in the United States, the court concludes that the plaintiffs have not taken sufficient steps to support a finding that they were adequately prepared to enter the U.S. market.

a. The plaintiffs have introduced sufficient evidence to support their contention that they reasonably feared suit by the defendants.

■ A plaintiff reasonably apprehends that it will find itself facing a lawsuit for trademark infringement when the defendant has engaged in a course of conduct that would cause a reasonable person to fear that he or she would face either an actual suit or the threat of one. *See Grafon Corp. v. Hausermann,* 602 F.2d 781, 783–84 (7th Cir.1979); *see also Enka,* 519 F.Supp. at 364 (noting that the defendant must have asserted its rights through "words or conduct" that would cause the plaintiff to "reasonably fear adverse action"). As the *Enka* court noted, contemporaneous lawsuits filed in foreign jurisdictions, which concern the same subject matter as the domestic litigation, lend credence to a plaintiff's claim that it reasonably anticipates being sued. 519 F.Supp. at 369.

Thus, even though the parties dispute, to a degree, the amount of litigation which has occurred between them in other foreign jurisdictions, they both agree that the defendants did bring a legal action against the Society over in Russia when the company began to sell its SMIRNOV vodka there. A pending litigation in a foreign country between essentially the same parties, even one that concerned a slightly different topic, has been found to create a objectively reasonably apprehension of suit. *See Ethicon, Inc. v. American Cyanamid Co.,* 369 F.Supp. 934, 936–37 (D.N.J.

1973). Therefore, even though it appears as if the defendants have never directly threatened the plaintiffs with legal action in the United States, the court concludes that the plaintiffs have introduced sufficient evidence to support their claim that they reasonably feared a lawsuit if they attempted to enter the U.S. market. *Cf. Simmonds Aerocessories, Ltd. v. Elastic Stop Nut Corp. of America,* 257 F.2d 485, 490 (3d Cir.1958) (recognizing that "it is not essential [for] there to be a direct threat of litigation in order to invoke the Declaratory Judgment Act.").

Nevertheless, because the court finds that the plaintiffs have not evinced an immediate intent and ability to enter the U.S. market, it finds that they have not presented a justiciable case or controversy that is ripe for decision.

b. The plaintiffs, however, have not introduced sufficient evidence to support their assertion that they had the immediate intent and ability to enter the U.S. market.

In addition to experiencing a reasonable fear that it might be subjected to suit if it entered the relevant market, a plaintiff must also demonstrate that it has "more than a vague or general desire to use" the mark or marks in question and, instead, an "actual intent and ability to immediately engage in the allegedly infringing conduct." *See Starter,* 84 F.3d at 596; *see also Windsurfing,* 828 F.2d at 758 (quoting *Wembley, Inc. v. Superba Cravats, Inc.,* 315 F.2d 87, 90 (2d Cir.1963)). On this point, a plaintiff must show that it has taken adequate, meaningful, and active steps to prepare for its entry into the relevant market. *See G. Heileman,* 873 F.2d at 990–91 (citing *International Harvester Co. v. Deere & Co.,* 623 F.2d 1207, 1210, 1215 (7th Cir.1980)); *see also Starter,* 84 F.3d at 596 (citing *Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.,* 846 F.2d 731, 736 (Fed.Cir.1988)). Put differently, the plaintiff must have taken steps up to "the last point of before the point of no return." *See G. Heileman,* 873 F.2d at

990 (quoting 6A James W. Moore, *Moore's Federal Practice* ¶ 57.20, at 57–217) (cited with approval in *Starter*, 84 F.3d at 596).

Here, although the plaintiffs do currently manufacture and sell vodka under the SMIRNOV name in Russia, there is no evidence that they have taken *any* steps toward entering the U.S. market. *See Starter*, 84 F.3d at 596–97. In particular, they have no business plan or marketing campaign concerning their entry into the United States.[9] They also have not undertaken any advertising in the United States. In fact, they have not even submitted a draft or mock advertising campaign to show that they have, at the very least, invested some time, energy, money or even any thought into selling their vodka products here. *Cf. G. Heileman*, 873 F.2d at 991 (noting that the plaintiff had consulted with an advertising agency to discuss its new brand name). Moreover, the plaintiffs also have not conducted any consumer surveys, *see Starter*, 84 F.3d at 596, to determine a target customer base or the most appealing way in which to package or advertise their product. Nor have the plaintiffs made any strategic decisions with respect to who will distribute their vodka products once they are shipped to the United States for sale.[10] Furthermore, the plaintiffs have not obtained any approval from any government agency concerning their potential entry into the U.S. market. In fact, there is no evidence in

the record to suggest that the plaintiffs have even contacted a government agency to discuss the various requirements that they will have to meet before they can begin importing their SMIRNOV vodka here for sale. Thus, even though the plaintiffs have submitted a label to the *court* which they claim will serve as the one they intend to use in the United States, they have yet to submit this label to the relevant *federal agencies* to gain their approval. *See* 28 U.S.C. § 203 (1994). In addition, they have yet not sought any state approval or licenses for the distribution of their vodka products. *See, e.g.*, Del.Code Ann. tit. 4, § 501 (1998). Finally, the plaintiffs have not demonstrated that even if they had made all of these plans, signed all of the necessary distribution agreements, and obtained the necessary government approval to bring their product to market, they would be able to "enter the United States market in quantity." *See Muller v. Olin Mathieson Chem. Corp.*, 404 F.2d 501, 505 (2d Cir.1968). Put simply, there is no evidence in the record concerning the amount of vodka the Society would be able to produce for export to the United States.[11] If the Society instead intends to manufacture its vodka domestically, then it has failed to demonstrate that it has entered into or even attempted to execute any agreements which would allow the Society to enter the

---

**9.** Although the plaintiffs claim that they have "concrete plans" to enter the U.S. market, the only evidence that they cite in support of this contention is their retention of two executives, Jerome Mann and William Walker, to provide advice concerning their anticipated entrance into the United States. However, there is no evidence that any "advice" that Messrs. Mann or Walker may have given the plaintiffs was ever formally written down on paper, let alone communicated to anyone.

**10.** On this point, the plaintiffs allege that they have been prevented from entering into any distribution or joint venture agreements because of the defendants' implied threat of suit. Specifically, the plaintiffs claim that no distributor or prospective business partner will sign a contract with them because they have

been secretly contacted by the defendants and threatened with litigation if they cooperate in any way with the plaintiffs. However, the only evidence which the plaintiffs introduce to support this claim is one lone letter from a single distributor, which as the plaintiffs themselves admit, does not explicitly list this reason as the one why it broke off negotiations with them.

**11.** Although the plaintiffs claim that the Joint Stock Society's Russia facilities are presently able to produce anywhere between 200,000 to 500,000 bottles of vodka per month for consumption in Russia, there is no evidence in the record concerning the amount of vodka the Society intends to produce for export or if it even intends to export at all.

U.S. market in any quantity, large or small.[12]

In this respect, the plaintiffs have done nothing to elevate this controversy beyond anything more than a theoretical dispute between two companies that may, one day, find themselves competing with one another. *See Polaroid Corp. v. Berkey Photo Inc.*, 425 F.Supp. 605, 608, 609 (D.Del. 1976). Like the party in *Polaroid*, the defendants here "ha[ve] not ... alleged any facts regarding [their] plans, as nebulous or certain as they may be, which would inform the court of the substance and scope of [their] intentions." *Id.* Thus, while the plaintiffs may be "anxious" to enter the U.S. market, *see Muller*, 404 F.2d at 505, there is no evidence that they are also "ready and able" to do so. *Id.*

In short, the court has no evidence upon which it could base a finding that the plaintiffs have "invested a significant amount of time and money" in their plan to enter the U.S. market and begin selling their vodka. *See Starter*, 84 F.3d at 596; *see also G. Heileman*, 873 F.2d at 991 (noting that the plaintiff had "incurred considerable expenses in developing a market" for its product). Instead, all that the plaintiffs have manifested is an interest to use the SMIRNOV name in connection with the *anticipated* sale of their products in the United States.

However, as the Federal Circuit has noted, this type of mere desire fails to constitute a justiciable case or controversy. *See Windsurfing*, 828 F.2d at 758 (citing *Wembley*, 315 F.2d at 90); *see also Golden Gulf Corp. v. Jordache Enters., Inc.*, 896 F.Supp. 337, 340 (S.D.N.Y.1995) (citing same). In fact, just like the party in *Windsurfing*, "[r]ather than use the mark, get sued, and fight it out in court," the plaintiffs here are saying "We would like to use the mark, but before we do, we want a court to say [that] we may do so

safely." 828 F.2d at 758. In this respect, the plaintiffs are effectively asking the court to issue an advisory opinion about the implications of some *possible* future course of action undertaken pursuant to a hypothetical business plan; an opinion which this federal court is not allowed to express. *See id.* (citing *Aetna*, 300 U.S. at 241, 57 S.Ct. 461).

Thus, even though the law does not require the plaintiffs to "perform a useless act," *see Bowen Eng'g v. Estate of Reeve*, 799 F.Supp. 467, 489 (D.N.J.1992) (citing, *inter alia*, *Association of Westinghouse Salaried Employees v. Westinghouse Elec. Corp.*, 283 F.2d 93, 96 (3d Cir.1960)), it does require them to do something, which is basically the one thing that the plaintiffs in this case have not done. In the words of the *Starter* and *G. Heileman* courts, in order to avoid finding themselves the subjects of a lawsuit, the plaintiffs here have stopped at some point *before* the last point before the point of no return. *See Starter*, 84 F.3d at 596 (quoting *G. Heileman*, 873 F.2d at 990). As stated earlier, unlike the plaintiffs in those two actions, the plaintiffs here have not made *any* investment in entering the U.S. market. *See G. Heileman*, 873 F.2d at 991 (noting that the plaintiff had "already expended many thousands of dollars for product development and the creation of a bottle label and can designs" in addition to "developing a market" for its product); *see also Starter*, 84 F.3d at 596 (describing how the plaintiff had "designed and prepared [a] prototype" and "made strategic decisions regarding who should manufacture" the product). In this respect, the plaintiffs in this case "are seeking to secure a ... judgment before incurring any costs which might prove to have been wastefully expended should this court find that" their anticipated business activities infringe on the defendants' trademark rights. *See Heerema Marine Con-*

---

**12.** Again, the plaintiffs claim that the defendants have prevented them from entering into joint venture agreements by either directly or indirectly threatening suit. However, the

plaintiffs fail to point to any evidence in the record to support this contention. *See* Note 10 *supra*.

*tractors v. Santa Fe International Corp.,* 582 F.Supp. 445, 451 (C.D.Cal.1984). However, as the Constitution makes clear, this the court cannot do. *See id.* (noting that the desire to "mitigat[e] economic waste does not allow a business to obtain a purely advisory opinion from the court").

Moreover, as the plaintiffs themselves recognize, even if they had prepared concrete business plans, marketing strategies, and advertising campaigns, they are still several steps away from being able to actually enter the U.S. market and sell their SMIRNOV vodka. Putting aside the fact that they lack any business partners and have not entered into any distribution agreements to ensure that they could actually place their vodka on store shelves in sufficient quantity, the plaintiffs also have not obtained approval from any federal, state, or local government agency, which is a prerequisite for doing business in the heavily regulated alcohol industry. *See, e.g., Adolph Coors Co. v. Bentsen,* 2 F.3d 355, 356 (10th Cir.1993) (citing 27 U.S.C. §§ 201–11); *Fedway Assocs., Inc. v. United States Treasury, Bureau of Alcohol, Tobacco & Firearms,* 976 F.2d 1416, 1418 (D.C.Cir.1992) (citing same); *Delaware Alcoholic Beverage Wholesalers, Inc. v. Ayers,* 504 A.2d 1077, 1078–80 (Del.1986) (citing Del.Code Ann. tit. 4, § 101 *et seq.* (1984)). In the face of these multiple contingencies, the court cannot conclude that this case is ripe for decision. *See Kiser v. Johnson,* 404 F.Supp. 879, 886 (M.D.Pa. 1975); *cf. Abbott Labs. v. Zenith Labs., Inc.,* 934 F.Supp. 925, 938 (N.D.Ill.1995) (recognizing that even if approval by the Food and Drug Administration could be obtained within three months, this approval had yet to be granted at the time of the court's decision, and "there [wa]s no guarantee that the ... approval w[ould] be forthcoming on any particular date in the future").

To paraphrase the *Polaroid* court, if this court held in this trademark case that the plaintiffs' actions in a foreign country were sufficient to create a justiciable controversy in the United States, independent of any business activity undertaken here or of any concrete plans to commence commercial activity here, its ruling would completely undermine the basic tenets of the Article III case or controversy requirement. 425 F.Supp. at 609. The door would open to unlimited efforts by other foreign companies who may have rights to a similar trade name or trademark in their countries but wanted to obtain an advisory opinion from a federal court in an effort to limit their potential liability. Such a ruling would "fly in the face of the clear constitutional mandate governing the functioning of the federal judiciary." *Id.* It would essentially turn every hope or dream of striking it rich in America into a live or actual "case or controversy" under the U.S. Constitution, regardless of the steps taken toward actually entering the marketplace here.[13]

While the court does not doubt that the plaintiffs have refrained from entering the U.S. market out of a genuine fear that they might find themselves the subject of a lawsuit for trademark infringement initiated by the defendants, *cf. Enka,* 519 F.Supp. at 369, the court cannot help but notice that, out of an apparent over-abundance of caution, the plaintiffs have not taken *any* steps in preparation for their entry into the United States. As a result, they have failed to demonstrate an immediate intent as well as the present ability to enter the U.S. market. In the words of the *Heerema* court, while the plaintiffs may be able to avoid engaging in some "economically wasteful activity" before bringing suit, they cannot "avoid all potentially wasteful activity" since the risk that

---

**13.** In addition, the court believes that such a ruling would threaten to turn one of the fundamental tenets of trademark law, territoriality, on its heady since it would essentially allow the foreign use of a particular trade-mark to create the right to use that mark in the United States. *But see, e.g., La Societe Anonyme des Parfums le Galion v. Jean Patou, Inc.,* 495 F.2d 1265, 1270 n. 4 (2d Cir.1974).

an adverse ruling might render some of their activities fruitless is the "risk [that] must be taken as a prerequisite [for] seeking judicial relief" in order to ensure that "an actual controversy is presented to the court." 582 F.Supp. at 449. Consequently, the court finds that this case fails to present a justiciable case or controversy under Article III of the United States Constitution. As a result, it dismisses the plaintiffs' case for lack of subject matter jurisdiction. *See* Fed R. Civ. P. 12(h)(3) (1998).

B. The Plaintiffs Lack Standing To Bring Their Asserted Claims.

Were the plaintiffs able to establish the existence of an Article III case or controversy that is ripe for decision, the court would still have to conclude that their particular claims are barred because the plaintiffs lack standing to assert them.

When addressing the question of standing, the court essentially asks whether the particular litigant before it is entitled to have the court decide the merits of its particular dispute or of the particular issues raised within it. *See Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). In answering this question, the court must focus its analysis on six factors—three constitutional and three prudential. Because the plaintiffs fail to satisfy essential elements of both these requirements, the court will grant summary judgment in favor of the defendants.

1. The plaintiffs fail to meet at least one of the constitutional standing requirements.

■ In order to satisfy the three constitutional standing requirements, a plaintiff must show that it has (1) suffered or will imminently suffer an injury, which is (2) fairly traceable to the defendant's conduct and which is (3) likely to be redressed by a favorable federal ruling on the matter. *See Northeastern Florida Chapter of the Associated Gen. Contractors of America v. City of Jacksonville, Florida,* 508 U.S. 656, 663, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993). On this first point, a plaintiff must show that this injury is "actual or imminent, not conjectural or hypothetical." *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (internal quotation marks and citations omitted). In addition, a plaintiff who seeks injunctive relief must show that the defendant's conduct will likely cause injury in the future. *See City of Los Angeles v. Lyons,* 461 U.S. 95, 105–06, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983).

■ By their own admission, the plaintiffs will not attempt to enter the U.S. market unless and until this lawsuit is resolved in their favor. Consequently, they have not demonstrated that they have suffered an actual or imminent injury or are likely to suffer an injury in the future. In other words, because they presently lack the immediate intent and present ability to market their vodka products in the United States, the plaintiffs fail to satisfy the minimum requirements necessary to establish standing under the United States Constitution.

2. The plaintiffs also fail to meet several of the prudential standing requirements.

In addition, the plaintiffs also fail to satisfy the prudential requirements [14] necessary to maintain standing under the Lanham Act and the Delaware Deceptive Trade Practices Act. *See* 15 U.S.C. § 1051 *et seq.;* Del.Code Ann. tit. 6, §§ 2531–36.

---

**14.** In addition to the constitutional standing requirements which originate out of Article III, the federal courts have, on their own accord, adopted a set of self-imposed restrictions on the exercise of federal jurisdiction. *See* Chemerinsky, Federal Jurisdiction § 2.3 at 57, 97–101. These judicial or "prudential" limitations are generally designed to prevent the courts from deciding broad questions of social import where no individual rights would be vindicated. *See Davis v. Philadelphia Housing Auth.,* 121 F.3d 92, 96 (3d Cir. 1997).

Specifically, the plaintiffs here fail to demonstrate that the interests that they seek to protect fall "within the 'zone of interests' intended to be protected by the[se] statute[s]." *See Conte Bros. Automotive, Inc. v. Quaker State–Slick 50, Inc.*, 165 F.3d 221, 226 (3d Cir.1998).

### a. The plaintiffs have no standing to bring their claims under Sections 43 and 34 of the Lanham Act.

■ Although Section 43 of the Lanham Act specifically provides that "*any* person ... who believes that he or she is likely to be damaged" by false or misleading statements about any good or service used in commerce may bring an action in federal court, 15 U.S.C. § 1125(a) (emphasis added), most courts have declined to interpret this language literally since such an "expansive reading would further flood the already overcrowded federal courts." *See, e.g., Serbin v. Ziebart Intn'l Corp.*, 11 F.3d 1163, 1174 (3d Cir.1993) (citing *Colligan v. Activities Club of New York*, 442 F.2d 686, 693 (2d Cir.1971)). Instead, these courts have come to the conclusion that, in order to maintain standing under Section 43, a litigant must, at a minimum, establish the "potential for a commercial or competitive injury." *See, e.g., Berni v. International Gourmet Restaurants of America, Inc.*, 838 F.2d 642, 648 (2d Cir.1988). In light of this requirement, the Third Circuit has traditionally asked whether the party has a "reasonable interest" to protect under the statute. *See, e.g., Thorn v. Reliance Van Co.*, 736 F.2d 929, 933 (3d Cir.1984).

Recently, in an effort to provide district courts with an appropriately flexible analysis to address the disparate factual scenarios that typically arise under the Lanham Act, the Third Circuit refined the *Thorn* test. *See Conte Bros.*, 165 F.3d at 233 (citing *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 538–44, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983)). Recognizing that the Act was intended to "ferret out unfair competitive methods and [to] protect businesses from the unjust erosion of their good will and reputation," *id.* at 236, the Third Circuit crafted a multi-part standing inquiry, which essentially explores the connection between the plaintiff's alleged injury and the defendant's purportedly wrongful conduct. *Id.* at 233–35. Because the court finds that this connection is too tenuous in this case to confer standing upon the plaintiffs, it will grant summary judgment in favor of the defendants.

### i. The plaintiffs' alleged injuries are not the type that Congress sought to redress under the Lanham Act.

First, as the *Conte Bros.* court noted, "while there may be circumstances in which a non-competitor · has standing to sue ..., the focus of the Lanham Act is on 'commercial interests [that] have been harmed by a competitor's false advertising' and in 'secur[ing] to the business community the advantages of reputation and good will by preventing their diversion from those who have created them to those who have not.' " *Id.* at 234 (citations omitted). Here, however, the court does not believe that the plaintiffs have either asserted a sufficient commercial interest or suffered an actual competitive harm that would satisfy the *Conte Bros.* standard.

Specifically, as the plaintiffs admit, they have no commercial presence in the United States. In fact, they do not plan on obtaining a presence here until and unless they win this lawsuit. As a result, even though the plaintiffs and defendants are "head-to-head" or direct competitors over in Russia, they do not compete at all, whether directly or indirectly, in the United States. Without a commercial presence, the court cannot conclude that the plaintiffs have asserted a legitimate commercial interest to protect or have suffered a tangible competitive harm within the meaning of the Lanham Act. *See PDK Labs, Inc. v. Friedlander*, 103 F.3d 1105, 1112 (2d Cir.1997) (recognizing that the litigant "d[id] not currently sell a ... product that compete[d] with [his opponent's] products," regardless of whether that par-

ty was acting lawfully or unlawfully); *see also Stanfield v. Osborne Indus., Inc.*, 52 F.3d 867, 873 (10th Cir.1995) (noting that the plaintiff was not then, nor had ever been, in competition with the defendants at any level).

And, even though a "future 'potential for a commercial or competitive injury' can establish standing" under certain circumstances, see *PDK*, 103 F.3d at 1112 (citing *Berni*, 838 F.2d at 648), the court believes, as it has already discussed, that the plaintiffs mere hopes or dreams of entering the U.S. market to sell their SMIRNOV vodka products are presently too tenuous or nebulous to establish standing under the Lanham Act. *See PDK*, 103 F.3d at 1112; *cf. Waldron v. British Petroleum Co.*, 231 F.Supp. 72, 81–82 (S.D.N.Y.1964) (noting that, under anti-trust law, the plaintiff must "show that he has the intention and preparedness to engage in th[e respective] business") (citing *Triangle Conduit & Cable Co. v. National Elec. Prods. Corp.*, 152 F.2d 398, 400 (3d Cir.1945)).

An examination of the plaintiffs' alleged injuries adds further support to this conclusion. According to the plaintiffs, perhaps the "worst injury" that they suffer is the "complete barrier to entry into the United States vodka market" imposed by the defendants' virtual "trademark monopoly" over the SMIRNOFF name and associated marks. However, in the opinion of the court, this asserted injury does not arise out of a violation of the Lanham Act. Instead, it seems to stem from the defendants' threat to sue the plaintiffs under the Lanham Act for trademark infringement if they attempt to enter the U.S. market with their SMIRNOV vodka products. However, the court doubts that the threat to sue another party under the Lanham Act can give rise to a violation of that same Act. Instead, in the opinion of the court, this asserted anti-competitive harm is better recognized, if at all, under other statutes. *See Coca–Cola Co. v. Overland, Inc.*, 692 F.2d 1250, 1257–58 (9th Cir.1982); *Letica Corp. v. Sweetheart Cup Co.*, 790 F.Supp.

702, 704–07 (E.D.Mich.1992); *cf. Car–Freshner Corp. v. Auto Aid Mfg. Corp.*, 438 F.Supp. 82, 87 (N.D.N.Y.1977) (recognizing that the test to determine "whether a trademark is being used to confer a monopoly in a certain product" is properly conducted "under Section 2 of the Sherman Act, 15 U.S.C. § 2," which requires a showing that the defendant's "actions have led to or resulted in a dangerous probability that it will gain a monopoly over the *product* in issue") (emphasis added).

For these reasons, the court cannot conclude that the plaintiffs have asserted injuries which the Lanham Act was intended to protect.

> ii. The plaintiffs' alleged injuries are indirect and speculative.

Without a commercial presence, the plaintiffs cannot establish that they suffer a direct injury from any of the defendants' actions. Most notably, as the plaintiffs themselves admit, they cannot show that they have actually lost sales or profits to the defendants' competing products since, given their absence from the U.S. market, the plaintiffs have never sold any of their products here in the first place. *Cf. A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 166 F.3d 197, 209 (3d Cir. 1999). Recognizing this deficiency in their case, the plaintiffs have advanced three alternative damage theories.

In addition to their request for punitive and treble damages, they seek (1) the disgorgement of all of the defendants' profits since 1982, which they estimate at roughly $1 billion, (2) a reasonable royalty for the defendants' use of the SMIRNOFF name since 1939, which they calculate at approximately $300 million, and (3) the costs of a corrective advertising campaign, which would run anywhere between $20 to $120 million. Thus, from one perspective, the plaintiffs appear to allege specific damages figures. However, a closer inspection reveals that these numbers are supported by nothing other than sheer speculation.

For example, in support of their request for a reasonable royalty, the plaintiffs allege only that "Eugenia might well have considered ... licensing her name." Thus, by definition, the plaintiffs are engaging in speculation. In short, "[a]ny royalties that might have accrued due to other potential licensing agreements [which were never explored at the time] are [purely] speculative." *See Jacobson v. Kawasaki Heavy Indus. Ltd.*, No. CV 89–2008, 1991 U.S. Dist. LEXIS 14519, at *16–18 (C.D.Cal. July 23, 1991). Put differently, the claim that Eugenia "lost royalties from unnamed licensees for unnamed amounts" for a time when she was not even licensing her name is based on nothing other than mere conjecture. *See id.* at *18.

The other damage theories advanced by plaintiffs suffer from even more serious flaws. Most notably, as the defendants point out, these theories are based on the faulty premise that the plaintiffs may act as a "vicarious avenger" of the general public's right to be protected against potentially false advertisements. *Cf. Serbin*, 11 F.3d at 1175 (rejecting this approach) (quoting *Sandoz Pharmaceuticals Corp. v. Richardson–Vicks, Inc.*, 902 F.2d 222, 230 (3d Cir.1990)). However, for the very reason that the Lanham Act does not confer standing upon consumers, *see id.* at 1174 (citing *Colligan*, 442 F.2d at 693), this court should not interpret the statute as allowing a litigant to seek redress for diffuse injuries purportedly spread across the public at large. *Cf. Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 963 (7th Cir.1992) (recognizing that an award of $24 million, which amounted to ten percent of the defendant's profits, conferred a "windfall" upon the plaintiff, which "b[ore] no relationship to that [party's arguably unjust] enrichment").

Thus, while the court recognizes the evidentiary leniency afforded to litigants who claim that they have been partially or totally excluded from the marketplace as a result of another's actions, *see Danny Kresky Enterprises Corp. v. Magid*, 716 F.2d 206, 212–13 (3d Cir.1983) (citing *Zenith Radio Corp. v. Hazeltine Research Corp., Inc.*, 395 U.S. 100, 123–24, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969)), the court cannot help but notice that by seeking the disgorgement of the defendants' profits from 1982 to the present, the plaintiffs are essentially asking to recover for an eleven to thirteen year period when they did not even exist. As a result, they could not have possibly suffered any commercial or competitive injury during this time period. Moreover, while the plaintiffs attempt to sidestep this issue by pointing out that they are asserting the rights that the French Smirnoffs possessed in the years which led up to this lawsuit, the court feels obligated to point out that Boris, the sole surviving descendent of the French Smirnoffs, was not engaged in any commercial activity concerning the use of the SMIRNOFF name until 1994, the year before this lawsuit was filed. Consequently, any injuries that he may have incurred as a result of the defendants' conduct, like those suffered by his mother and grandmother, are at best conjectural.

iii. The plaintiffs are too far removed from the alleged misconduct and, thus, the risk of duplicative damage awards is great.

Finally, as the *Conte Bros.* court noted, "the 'existence of an identifiable class of persons'—manufacturers of competing products—'whose self-interest would normally motivate them to vindicate the public interest ... diminishes the justification for allowing a more remote party ... to perform the office of a private attorney general.'" 165 F.3d at 234 (quoting *Associated Gen. Contractors*, 459 U.S. at 542, 103 S.Ct. 897). Here, there are several companies which produce a vodka product that directly competes with the defendants' SMIRNOFF brand in the United States. Thus, even though none of these companies has yet to file a legal action against the defendants, the plaintiffs cannot escape the reality that, by their very actions, they have distanced themselves from the very

market which the Lanham Act was designed to regulate. *Cf. Galavan Supplements, Ltd. v. Archer Daniels Midland Co.,* No. C. 97–3259, 1997 WL 732498, at *1, *4 (N.D.Cal. Nov.19, 1997) (concluding that the plaintiff, who was a foreign company representing a "class of all persons and entities outside the United States who purchased" the defendant's products, could not maintain standing under the anti-trust laws since that party "was 'neither a competitor nor a consumer' in the United States domestic market"). And, in light of the number of other companies which presently compete within the domestic vodka market, the defendants face a great risk of multiple lawsuits and, thus, potentially duplicative damage awards for essentially the same alleged conduct.

For these reasons, the plaintiffs fail to satisfy the prudential standing requirements necessary to maintain their claims under Section 43 of the Lanham Act. In addition, since the injunction they seek is directly dependent upon a violation of Section 43, the plaintiffs lack standing to assert a claim under Section 34 of the same statute. *See* 15 U.S.C. § 1116.

b. The plaintiffs have no standing to bring their claims under the Delaware Unfair Trade Practices Act.

Despite the language of subsection (b), the Delaware state courts have interpreted their Unfair Trade Practices Act, Del.Code Ann. tit. 6, § 2532, as prohibiting "unreasonable or unfair interference with the 'horizontal' relationships between various business interests," *see Grand Ventures, Inc. v. Whaley,* 632 A.2d 63, 70 (Del.1993), which affords standing to only those businesses which are competing against each other in the marketplace. *See S & R Assocs., L.P., III v. Shell Oil Co.,* 725 A.2d 431, 440 (Del.Super.1998); *Pack & Process, Inc. v. Celotex Corp.,* 503 A.2d 646, 649 n. 1 (Del.Super.1985). Thus, while the Society may be competing "head-to-head" with UDV in Russia, by their own admission, the plaintiffs have no market presence in the United States. As a re-

sult, the court cannot conclude that they actually compete with the defendants domestically. For this reason, the plaintiffs have no standing to sue under the Delaware Unfair Trade Practices Act. *See S & R Assocs.,* 725 A.2d at 440; *Pack & Process,* 503 A.2d at 649 n. 1.

However, even if this court were to interpret the "horizontal relationship" test annunciated by the Delaware Supreme Court more liberally than the Delaware Superior Courts, *see* 4 Thomas J. McCarthy, *McCarthy on Trademarks & Unfair Competition* § 27:32 at 27–51 (4th ed.1996) (hereinafter, *McCarthy* ), it would still conclude that the plaintiffs lack standing to assert their state law claims because they fail to assert a "reasonable interest" which deserves protection under the Lanham Act. *See Serbin,* 11 F.3d at 1176–77. In particular, as the *Conte Bros.* court interpreted the *Serbin* standard, "parties who are not in direct competition with each other (because they are 'doing business at different economic levels') nevertheless may have standing to sue if they have a 'reasonable interest to be protected against false advertising.' " *See Conte Bros.,* 165 F.3d at 231. Thus, the parties need not be "directly" competing with one another as long as one of them is a "surrogate" for a direct competitor. *See id.*

Here, however, the parties are not competing with each other in *any* way, whether direct or indirect, in the current domestic vodka market because, as the plaintiffs themselves admit, they have no intention of entering this market until and unless they prevail in this lawsuit. Consequently, the court cannot conclude that the plaintiffs have a "reasonable interest" which deserves protection from the defendants' advertising, false or otherwise. In short, absent a presence in the United States, the plaintiffs have no commercial interests to protect. For this reason, they lack standing to maintain their claims under Delaware's Deceptive Trade Practices Act.

c. The plaintiffs lack standing to bring their claims under Sections 38 and 37 of the Lanham Act.

The plaintiffs' claims under Sections 38 and 37 of the Lanham Act, 15 U.S.C. §§ 1120, 1119, fail for related reasons.

■ Specifically, although Section 38 also provides a cause of action to "'any person injured' by a false or fraudulent registration of a trademark," the federal courts have read into this language the same "reasonable interest" requirement necessary to maintain standing under the other provisions of the Lanham Act. *See, e.g., Jackson v. Lynley Designs, Inc.,* 729 F.Supp. 498, 499–500 (E.D.La.1990). In addition, pursuant to the statute, a plaintiff must show that its injuries were "sustained in consequence" of the fraudulent activity. *See* 15 U.S.C. § 1120.

Here, the plaintiffs did not exist at the time the defendants or their predecessors registered their trademarks. As a result, they "w[ere] not immediately injured" by the registration. *See Gilbert/Robinson, Inc. v. Carrie Beverage–Missouri, Inc.,* 989 F.2d 985, 990 (8th Cir.1993). In addition, because there has been only one company marketing SMIRNOFF vodka in the United States since 1933, the plaintiffs cannot show that the defendants' registrations "fostered either consumer confusion or unfair competition at the time." *Id.* Thus, like the litigant in *Gilbert/Robinson,* the plaintiffs here have failed to allege an injury that falls within the "zone of interests" that Section 38, 15 U.S.C. § 1120, was intended to protect. *Id.* As a consequence, the court cannot conclude that the plaintiffs satisfy the minimal prudential standing requirements under the Act.[15]

Finally, without standing to maintain a cause of action under the other provisions of the Lanham Act, the plaintiffs also cannot maintain an action to cancel the registration[16] of the defendants' SMIRNOFF trademarks under the provisions of the same statute. *See Ditri v. Coldwell Banker Residential Affiliates, Inc.,* 954 F.2d 869, 873–74 (3d Cir.1992) (citing, *inter alia, Windsurfing,* 828 F.2d at 758).

For these reasons, the court will grant summary judgment in favor of the defendants on all counts of the plaintiffs' complaint.

C. The Plaintiffs' Action Is Barred By The Doctrine Of Laches.

Finally, even if the plaintiffs did meet both constitutional and prudential standing requirements, the court would nevertheless have to dismiss the plaintiffs' action on the grounds that it is barred under the doctrine of laches.

■ In the Third Circuit, laches will serve to bar both monetary and injunctive relief in the face of (1) an inexcusable delay in bringing suit which results in (2) severe prejudice to the party defending

---

**15.** In addition, although the plaintiffs are seeking to assert the rights that the French Smirnoffs had during this time, the court notes that these individuals were neither engaging in nor attempting or preparing to engage in any type of commercial activity under the SMIRNOFF name anywhere in the world at the time and, thus, did not compete either directly or indirectly with the defendants. As a result, the court believes that any personal interest that they possessed in curtailing the use of their family name would have been insufficient to confer standing upon them at the time. *Cf. Dovenmuehle v. Gilldorn Mortgage Midwest Corp.,* 871 F.2d 697, 700–01 (7th Cir.1989) (finding that a family's asserted interest in retaining control over the use of its surname, separate and apart from the sale of the family business which bore that name, failed to amount to a "reasonable interest" protected under the Lanham Act).

**16.** Although the plaintiffs allege that they are bringing their cancellation claims under Sections 14 and 37 of the Lanham Act, *see* 15 U.S.C. §§ 1064, 1119, the court believes that the former provision only relates to those applications filed with the U.S. Patent and Trademark Office to cancel a registered mark. *See id.* at § 1067; *see also Windsurfing,* 828 F.2d at 758 (recognizing that the section "does not ... authorize suits for cancellation in [the] district courts"). As a result, the court only considers the claim asserted under Section 37.

the claims brought against it. *See Pappan Enters., Inc. v. Hardee's Food Sys., Inc.,* 143 F.3d 800, 804 (3d Cir.1998); *see also W.L. Gore & Assocs. v. Totes, Inc.,* 788 F.Supp. 800, 812 n. 19 (D.Del.1992) (citing *University of Pittsburgh v. Champion Prods., Inc.,* 686 F.2d 1040, 1044 (3d Cir. 1982)). Delaware law is in accord. *See United States Cellular Inv. Co. v. Bell Atl. Mobile Sys., Inc.* 677 A.2d 497, 502 (Del. 1996) ("Laches is an affirmative defense that the plaintiff unreasonably delayed in bringing suit after the plaintiff knew of an infringement of his rights, thereby resulting in material prejudice to the defendant.") (citing *Nationwide Mut. Ins. Co. v. Starr,* 575 A.2d 1083, 1088 (Del.1990)). Because the plaintiffs are seeking to assert the rights of the French Smirnoffs,[17] the court can charge them with the consequences of their predecessors' failure to act for over sixty years, despite their knowledge that three other companies were using their family name without their permission. *See Borg–Warner Corp. v. York–Shipley, Inc.,* 293 F.2d 88, 94 (7th Cir.1961); *accord Anheuser–Busch, Inc. v. Du Bois Brewing Co.,* 175 F.2d 370, 372 n. 4 (3d Cir.1949); *see also Charvet S.A. v. Dominique France, Inc.,* 568 F.Supp. 470, 474 (S.D.N.Y.1983) ("Since [the] plaintiff's claim[ ] to the mark derives through the original firm, it is charged with that firm's knowledge."). Finally, because the plaintiffs are challenging over sixty years worth of conduct by the defendants or their predecessors, which far exceeds the applicable three-year statute of limitations period,[18] they must "come forward and prove that [their] delay was excusable and that it did

not unduly prejudice" their opponents. *See Lasseigne v. Nigerian Gulf Oil Co.,* 397 F.Supp. 465, 473 (D.Del.1975) (citing *Gruca v. United States Steel Corp.,* 495 F.2d 1252, 1259 (3d Cir.1974); *Burke v. Gateway Clipper, Inc.,* 441 F.2d 946, 949 (3d Cir.1971)). In other words, the burden to disprove the two elements of laches rests with the plaintiffs. *See Churma v. United States Steel Corp.,* 514 F.2d 589, 593 (3d Cir.1975); *Francis v. Pan American Trinidad Oil Co.,* 392 F.Supp. 1252, 1257 (D.Del.1975). Because the plaintiffs cannot carry this burden, the court will grant summary judgment in the defendants' favor.

1. The French Smirnoffs knew that the defendants and their predecessors had been selling vodka under the SMIRNOFF name for over sixty years but never took any action of any kind in an attempt to vindicate their legal rights.

As the plaintiffs themselves admit, Eugenia, Tatyana, and Boris—*i.e.,* the French Smirnoffs—were well aware that Vladimir, Kunnett, and Heublein were all openly producing and selling vodka under the SMIRNOFF name both in Europe and in the United States for over sixty years. However, at no time during this period, did any of the French Smirnoffs ever notify any one of these individuals or companies to inform them that their practices might possibly infringe on any potential claim or right that the French Smirnoffs might have to the name or marks associat-

---

17. By their own admission, the plaintiffs—*i.e.,* the Joint Stock Society and RASCO—are not suing to vindicate any rights that they may have to either the SMIRNOFF or SMIRNOV names. Instead, they have entered into an agreement with Eugenia's grandson, Boris, which essentially allows them to sue the defendants in an effort to vindicate the rights that the French Smirnoffs have "in and to the business of the original trade house," including the "rights to use the SMIRNOV name, awards, insignia, and other marks owned by

the original trade house and the right to operate the business of the original trade house."

18. Because the Lanham Act does not contain a specific statute of limitations period, the court must look to state law to find the most analogous statute of limitations period. *See Beauty Time, Inc. v. VU Skin Sys., Inc.,* 118 F.3d 140, 143 (3d Cir.1997). Here, that relevant time period is three-years. *See* Del.Code Ann. tit. 10, § 8106 (1994) (governing actions for fraud).

ed with the original trade house.[19]

a. The French Smirnoffs knew that Vladimir had formed a new company that was manufacturing vodka under the SMIRNOFF name yet took no action of any kind against him.

As early as the 1920s, the French Smirnoffs knew that Vladimir had formed the company Ste. Pierre Smirnoff Fls., *i.e.*, the Company of the Sons of Piotr Smirnov, and was selling vodka under the SMIRNOFF name in Europe in bottles which depicted the awards and medals won by the original Russian trade house back in the 1880s. Despite this knowledge and the admitted furor it generated with Eugenia, she never did anything to alert Vladimir that his actions were apparently in direct violation of the agreement that he signed in 1904 wherein he relinquished all rights to use the family name. In particular, Eugenia neither wrote to Vladimir nor visited him to express her displeasure with his actions. She also did not bring or, for that matter, even threaten suit in the face of Vladimir's possibly illegal activities. In fact, the record does not reveal that Euge-

nia even bothered to contact a lawyer to discuss her legal options with respect to her brother-in-law's actions.[20] In short, Eugenia never took any steps to inform her former brother-in-law that he should cease and desist with his operations or otherwise face the threat of litigation. Thus, even though the plaintiffs claim that Eugenia tried to preserve her rights to the SMIRNOFF name by writing letters to various friends and family members, the court cannot help but notice that she never wrote to or, in any other way, contacted the one person that she should have— namely, Vladimir.[21]

b. The French Smirnoffs also knew that Kunnett and, later, Heublein were both selling vodka under the SMIRNOFF name in the United States but, again, did nothing to alert these companies that their activities might possibly be improper.

More disturbing, this pattern of inaction repeated itself when Vladimir conveyed the exclusive right to use the SMIRNOFF name to Kunnett and, later, when Kunnett sold his rights to Heublein.[22] Although

**19.** Although the court has previously discussed the facts which follow in an earlier part of its opinion, it believes that a reiteration of these facts is necessary in order to properly frame the plaintiffs' unprecedented delay in filing suit and the severe prejudice that it has exacted upon the defendants.

**20.** *Admittedly, Eugenia seems to have written* a letter to her second husband, the diplomat, to ask for his advice on the matter, but there is no evidence in the record to establish that this person was actually a lawyer. And, even if he had been schooled in the law, the court would be hesitant to conclude that the reliance on the advice of counsel could serve as a valid excuse to justify over sixty years of inaction by the French Smirnoffs. *See Clyde v. Thornburgh*, 533 F.Supp. 279, 289 (E.D.Pa. 1982); *see also Baskin v. Tennessee Valley Auth.*, 382 F.Supp. 641, 646 (M.D.Tenn.1974) (citing *Landell v. Northern Pac. R.R.*, 122 F.Supp. 253, 258 (D.D.C.1954)). Finally, and most important, after reviewing this letter, the court notes that Eugenia's husband specifically wrote to her, "As you said very well, to start a lawsuit against the[defendants], you would have to have documents proving that the company belongs to you, *and* you can get

these documents from Moscow if you write to: Mavriki Osipovich Grischmann." Eugenia's husband then provided her with this person's address. However, there is no evidence that Eugenia ever attempted to contact this individual or any of the others that her husband mentioned in his letter.

**21.** As previously discussed, in an attempt to explain the French Smirnoffs' failure to initiate any form of contact with Vladimir, the plaintiffs claim that Eugenia considered her brother-in-law to be "a pariah, a cheat, and a crook." However, even if the court assumes that this perception was accurate, it feels obligated to point out that disliking or distrusting a person fails to constitute a legitimate reason for not promptly initiating a legal action against them, especially when they have supposedly committed a wrongful act.

**22.** Although the plaintiffs contend that both Kunnett and Heublein knew that Vladimir had no rights in the SMIRNOFF name to convey, they offer no evidence to support their allegations. Instead, they provide only bold assertions. However, as the court will soon discuss, given the tremendous amount of

the French Smirnoffs were aware that vodka was being sold in the United States under the SMIRNOFF name as early as the 1930s and that Kunnett was using the medals and insignia of the original trade house on their bottles and in his advertising, neither Eugenia nor Tatyana ever initiated any legal proceeding of any kind against Kunnett or his company. In fact, neither one of them ever even bothered to consult an attorney to discuss any claim they might have against Kunnett for his activities in the United States.[23]

Furthermore, when Heublein began producing and selling SMIRNOFF vodka in even greater quantities during the 1940s and 1950s, Eugenia and Tatyana again remained silent, at least with respect to placing the company on notice that it might not have any right to use not only the SMIRNOFF name but also the various emblems, honors, and awards referred to in the 1933 and 1939 agreements. However, just like Vladimir and Kunnett, Heublein never received one letter of complaint from either Eugenia or Tatyana informing the company that if it did not cease and desist its use of the SMIRNOFF name, emblems, medals, coats of arms, insignia, or other awards, then it would find itself facing a lawsuit.

Of course, during this time, the defendants were investing at first millions and, later, tens and hundreds of millions of dollars in advertising, marketing, and promoting their vodka under the SMIRNOFF name. In addition, the defendants invested countless millions of additional dollars in building distilleries, hiring and training thousands of employees, and creating distributor relationships. Moreover, during this sixty-year period, all of the parties

and, therefore, material witnesses to the crucial historical transactions at issue in this litigation have died. Consequently, the foundation for the plaintiffs' case is anchored primarily in hearsay.

2. The plaintiffs offer no legitimate excuse for this delay.

Although the plaintiffs claim that the French Smirnoffs could not have possibly filed suit against either Vladimir, Kunnett, or Heublein due to their impoverished condition, the court notes that (1) even the most favorable interpretation of the record reveals that the French Smirnoffs were far from destitute [24] and (2) even if they were living in abject poverty, that condition standing alone would not excuse their delay in bringing legal action for over sixty years. As the Supreme Court made clear over a century ago, "poverty or pecuniary embarrassment [i]s not a sufficient excuse for postponing the assertion of [one's] rights." *Leggett v. Standard Oil Co.*, 149 U.S. 287, 294, 13 S.Ct. 902, 37 L.Ed. 737 (1893) (cited with approval in *Hall v. Aqua Queen Mfg., Inc.*, 93 F.3d 1548, 1554 (Fed. Cir.1996)).

Admittedly, this court may consider poverty as a factor in its laches calculus as long as "there is some [other] legally cognizable excuse for an unreasonable delay." *See Hall*, 93 F.3d at 1554 (citing *Frank F. Smith Hardware Co. v. S.H. Pomeroy Co.*, 299 F. 544, 546–47 (2d Cir.1924)). However, as was the case in *Hall*, the plaintiffs in the case at bar can offer no valid excuse for their years of inactivity.

Specifically, throughout this litigation, the plaintiffs have pointed to the existence of the Iron Curtain and the tyranny of the

---

time that has passed, the defendants' state of mind is irrelevant to the court's analysis.

**23.** Apparently, the first and only time that the French Smirnoffs contacted a lawyer to discuss their claim to the family name was in 1958, the year of Eugenia's death, when Tatyana received "power of attorney" to defend her mother's "rights to the ownership of the title 'SMIRNOFF VODKA' ... which [she be-

lieved had] been unjustly used by third parties in violation of [her] rights." However, as the court will discuss, Tatyana took no action with respect to these rights during her lifetime, dying intestate in 1977.

**24.** For example, the record shows that the French Smirnoffs were able to maintain multiple homes and vacation at various resorts during this sixty to seventy year time period.

Soviet State to explain why the French Smirnoffs could not file a lawsuit[25] against either Vladimir, Kunnett, or Heublein. *Cf. Cuban Cigar Brands N.V. v. Upmann Intern., Inc.*, 457 F.Supp. 1090, 1097–98 (S.D.N.Y.1978) (discussing Castro's takeover of Cuba and the rise of the subsequent communist regime). This theory, however, fails for two reasons.

First, in *Cuban Cigar Brands*, the plaintiff did not simply flee Cuba to remain in exile for a period of fifteen to twenty years doing nothing. Instead, that party spent its time in exile rebuilding its business. *Id.* at 1097. As a result, its "attention and energy [were] focused ... away from any alleged infringing activities in this country," the United States. And, because that particular plaintiff was also involved in a protracted litigation with the Cuban government at the same time, the *Cuban Cigar Brands* court felt confident in saying that the plaintiff had been a "vigilant defender of its rights." *Id.* For this reason, it found that any delay was excusable.

Here, however, the French Smirnoffs have done nothing even remotely comparable to the *Cuban Cigar Brands* plaintiff. They did not attempt to rebuild their business after fleeing Russia; nor did they attempt to initiate a lawsuit against Vladimir, the one lone member of the Smirnoff family who did successfully attempt to rebuild the family business. In fact, neither Eugenia nor Tatyana even bothered to write Vladimir a letter, call him on the telephone, or visit him in person to complain about his use of the SMIRNOFF name. More troubling, none of the French Smirnoffs ever contacted Kunnett or Heublein in *any* way in the decades that followed, even though they were painfully aware that vodka was being sold in the United States under the SMIRNOFF name in bottles which bore a strong resemblance to those used by the original trade house. Consequently, the court cannot say that these individuals were "vigorously asserting and prosecuting their rights." *See Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena*, 293 F.Supp. 892, 918–19 (S.D.N.Y.1968). Instead, the court must reach the exact opposite conclusion—namely, that they "were ... sleeping on their rights ... leading [the] defendants to believe that no action would be taken," *see id.* at 919, indeed, that no one had an action to take.

Second, accepting as it has all of the representations made about the severity of the Soviet Criminal Code as true,[26] the court nonetheless feels obligated to make the obvious point that neither Eugenia nor her daughter nor her daughter's children were ever Soviet citizens at any point in time leading up to this lawsuit.

**25.** The plaintiffs, however, cannot explain why the French Smirnoffs never even bothered to *contact* these individuals. Even if the French Smirnoffs believed that they could not possibly win a lawsuit, the court still finds it disturbing that they never complained in any manner to either Vladimir, Kunnett, or Heublein. Specifically, neither Eugenia nor Tatyana nor Boris ever wrote a letter or made a telephone call to any of these individuals or their companies.

While the plaintiffs attempt to justify this inaction by noting Eugenia's distaste for and distrust of her brother-in-law, *see* Note 21 *supra*, this proffered reason fails to explain why Eugenia never contacted either Kunnett or Heublein. By the plaintiffs' own admission, Eugenia and her daughter Tatyana were writing letters to numerous individuals at the time in an attempt to find someone who might be able to obtain the documents they believed were necessary to establish their claim of ownership to the original trade house and its name.

As a result, the court cannot conclude that the French Smirnoffs were too poor to also send a letter to either Kunnett or Heublein, who were the very reason why Eugenia and Tatyana wanted to get the desired documentation in the first place. In fact, the court cannot discern any reason, nor have the plaintiffs offered any, that might even begin to explain why the French Smirnoffs never took any steps to place either Kunnett or Heublein on notice that their use of the SMIRNOFF name might be infringing, inadvertently or otherwise, on any right that the French Smirnoffs claimed to have in their family name.

**26.** *See* Note 1 *supra*.

Consequently, while the Soviet criminal laws may have prevented the French Smirnoffs from obtaining the documentary evidence they desired, *but see* Note 20 *supra*, these codes did not, in any way, prevent either Eugenia or Tatyana from speaking with various individuals living in their Russian émigré community. As the plaintiffs themselves admit, some these people "knew the story" of the original trade house and could thus testify about Eugenia's claim to ownership. In .fact, Eugenia's own grandson is today still able to identify some of these individuals by name, even though they now seem to have passed away.[27] Moreover, as the plaintiffs apparently concede, no Soviet law prevented Eugenia or Tatyana from seeking similar personal accounts from the numerous friends or family members, living behind the Iron Curtain, who received their letters. In addition, the plaintiffs have not pointed to any provision of the Soviet code which would have punished or, in any other way, prohibited the French Smirnoffs from placing the defendants or their predecessors on notice that they might be "unjustly" using the SMIRNOFF name.

Thus, while other district courts have recognized that the rise of a communist regime which is hostile to private business interests can excuse a plaintiff's delay in filing suit, *see Cuban Cigar Brands*, 457 F.Supp. at 1097–98, *Carl Zeiss*, 293 F.Supp. at 918–19, these courts have also recognized that the plaintiffs before them had, on their own accord, taken the initiative to ensure that they would have a right or interest to vindicate. Here, the French Smirnoffs did nothing. More troubling, they did not even try to do anything. They certainly did not try to notify the defendants or their predecessors that another might one day seek to lay claim to the SMIRNOFF name. Given the unreasonableness of this *in* action, the court cannot excuse it.

**3. The defendants have been severely prejudiced by this delay.**

As the Federal Circuit has noted, in the face of an unreasonable and inexcusable delay in filing suit, laches will operate to bar relief when the defendant has suffered *either* economic *or* evidentiary prejudice. *See Wanlass v. General Elec. Co.*, 148 F.3d 1334, 1337 (Fed.Cir.1998). Economic prejudice arises when a defendant will *either* lose the significant monetary investments it made in a product or project over time *or* incur significant monetary penalties as a result of conduct which could have been altered by an earlier lawsuit. *See id.* (quoting *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1033 (Fed.Cir.1992) (en banc)). Evidentiary prejudice arises when a defendant cannot "present a full and fair defense on the merits due to the loss of records, the death of witnesses, or the unreliability of memories of long past events." *See id.* (citing same). Here, given the sixty years that has passed, the defendants have suffered both types of prejudice in their most severe forms.

**a. The defendants would suffer severe economic prejudice if this lawsuit were to proceed.**

Over the last sixty years, the defendants have invested over $700 million in advertising, promoting, and marketing their vodka products under the SMIRNOFF name, making the brand the most popular vodka and the second most popular distilled spirit in the United States. In the opinion of the court, this change occurred "because of and as a result of the delay" in filing suit. *See Gasser Chair Co., Inc. v. Infanti Chair Mfg. Corp.*, 60 F.3d 770, 774–75 (Fed.Cir. 1995) (citing *Hemstreet v. Computer Entry Sys. Corp.*, 972 F.2d 1290, 1294–95 (Fed. Cir.1992)).

Most notably, unlike the *Gasser* or *Hemstreet* litigants, the defendants here

**27.** Specifically, at his deposition, Boris mentioned the names of two gentlemen, Messrs. Momentov and Shudinov, who apparently

"had [prior] dealings" with the original trade house and, thus, "knew it very well."

received *no* warning that they might have been infringing upon another's claimed trademark rights. *Cf. Hemstreet,* 972 F.2d at 1294 (recognizing that receiving "explicit notice" and "specific warning" of related actions against other infringers, the defendant "apparently made a deliberate business decision to ignore that warning and to proceed as if nothing had occurred"). And, given the nature of trademark rights and the manner in which they are acquired this "failure to warn" plays central role in the court's analysis.

Unlike patent law and, thus, unlike the specific rights at issue in the *Gasser* and *Hemstreet* cases, trademark law confers the right to exclude only through continued *use* in commerce, *not* through either invention or discovery. *See Buti v. Impressa Perosa, S.R.L.,* 935 F.Supp. 458, 468 (S.D.N.Y.1996) (citing 2 *McCarthy* § 16.03). In other words, unlike the patent laws which encourage pioneering innovations, the trademark laws are intended to foster fair competition. Thus, while the right to use a particular trademark to the exclusion of all others generally depends upon seniority or priority of use, *see id.* (citing 4 *McCarthy* §§ 29.01[1], 29.01[2] ), at times, a junior user may acquire the right to use a particular mark as the result of, say, the senior user's decision to abandon the mark or to acquiesce to the junior user. *See Manhattan Indus., Inc. v. Sweater Bee by Banff, Ltd.,* 627 F.2d 628, 630 (2d Cir.1980); *see also SunAmerica Corp. v. Sun Life Assurance Co. of Canada,* 890 F.Supp. 1559, 1577–78 (N.D.Ga. 1994).

Admittedly, depending upon the circumstances, the legal standard for proving abandonment can be quite high. *Compare West Florida Seafood, Inc. v. Jet Restaurants, Inc.,* 31 F.3d 1122, 1124 (Fed.Cir. 1994) (imposing a "preponderance of the evidence" standard in a cancellation proceeding) *with McKay v. Mad Murphy's, Inc.,* 899 F.Supp. 872, 878 (D.Conn.1995) (requiring proof by "clear and convincing evidence" when pled as an affirmative defense). In addition, acquiescence can be as equally difficult to prove. *See SunAmerica,* 890 F.Supp. at 1578 (emphasizing the defendant's active and affirmative consent to the plaintiff's use for over sixty years). However, in this case, the French Smirnoffs not only failed to use their family name in commerce for a period of over sixty years leading up to this lawsuit but also failed to contest the defendants' use of that name over the same time period.

Thus, even if the court presumed that:

(1) The French Smirnoffs had acquired a U.S. trademark right to the name and marks of the original trade house as a result of that company's scant sales of, at most, fifty cases of liquor in New York City prior to 1918, *but see Charles Jacquin et Cie, Inc. v. Destileria Serralles, Inc.,* 784 F.Supp. 231, 235 (E.D.Pa.1992),

(2) this right could be conveyed in gross, first through devise and later through the laws of intestacy, separate and apart from the original business which had by then been taken over by the Soviet State, *but see Berni v. International Gourmet Restaurants of America, Inc.,* 838 F.2d 642, 646 (2d Cir.1988); and

(3) the defendants were aware of this right in spite of the fact that no SMIRNOV or SMIRNOFF marks were ever registered with the U.S. Patent and Trademark Office until Kunnett submitted his application in 1934, *cf. Kraft, Inc. v. United States,* 30 Fed. Cl. 739, 784–85 (Fed. Cl.1994),

the court would nevertheless have to conclude that the failure to place the defendants or their predecessors on notice that they might be infringing upon another's right to the SMIRNOFF name proves fatal the plaintiffs' case.

The reason for this conclusion is a simple one. Namely, by definition, trademark rights are generally acquired only through use. *See, e.g., Flavor Corp. of America v.*

*Kemin Indus., Inc.,* 493 F.2d 275, 284 (8th Cir.1974). As a result, the French Smirnoffs' failure to use their name coupled with their failure take action against others would, at a minimum, establish a presumption of abandonment upon which, under these circumstances, the defendants could reasonably rely. *See AmBrit, Inc. v. Kraft, Inc.,* 812 F.2d 1531, 1550–51 (11th Cir.1986); *E. Remy Martin & Co., S.A. v. Shaw–Ross Intn'l Imports, Inc.,* 756 F.2d 1525, 1532–33 (11th Cir.1985).

In addition, even if the court put aside the hundreds of millions of dollars that the defendants have invested in their SMIRNOFF line over the past sixty years because it assumed that this investment was, say, "simply a business decision to capitalize on a market opportunity," *See Gasser,* 60 F.3d at 774 (citing *Hemstreet,* 972 F.2d at 1294), the defendants still find themselves the subject of a lawsuit seeking money damages for their conduct over half a century. However, if the defendants had received notice that they were possibly infringing on another's right to use the marks in question, then they could have changed their behavior a long time ago and, thus, avoided the incredible damages which have accumulated over time. *See Aukerman,* 960 F.2d at 1033 (citing *Rome Grader & Machinery Corp. v. J.D. Adams Mfg. Co.,* 135 F.2d 617, 619 (7th Cir.1943)); *cf. Haviland & Co. v. Johann Haviland China Corp.,* 269 F.Supp. 928, 950, 955 (S.D.N.Y.1967) (recognizing a laches defense where a party expanded its sales volume from $15,000 to $1.3 million over a forty year period).

By way of illustration, the plaintiffs presently seek a reasonable royalty of approximately two percent of the defendants gross sales dating back to 1939 for their use of the SMIRNOFF name and associated marks. However, in the early 1940s, the defendants were selling roughly 10,000 cases of vodka a year, which grossed approximately $200,000 annually. But, by the 1990s, the defendants had dramatically expanded their market share, selling on average five to six million cases of vodka a year, which earned them approximately $300 million in gross sales annually. Consequently, their exposure has increased from approximately $4,000 a year in 1939 to $6 million a year in 1999.[28] However, the plaintiffs or, more accurately, their predecessors had the power to, if not, halt then, at least, call attention to the exponential growth of this damage figure at any time by simply placing the defendants on notice that their conduct was possibly unlawful. But, by failing to take this simply step, the French Smirnoffs have exposed the defendants to an astronomical, yet completely avoidable, monetary penalty.

For these reasons, regardless of the burden of proof, the court concludes that the sixty-year delay in filing suit would cause the defendants extreme economic prejudice if this lawsuit were permitted to go forward.[29]

**28.** This assumes that, in 1939, Eugenia would have entered into a licensing agreement with Heublein that paid her a reasonable royalty equal to two percent of all the company's future gross sales instead of negotiating a flat flee for the single purchase of all of her rights.

**29.** In an attempt to avoid this conclusion, the plaintiffs cite *Alfred Dunhill of London, Inc. v. Kasser Distillers,* 350 F.Supp. 1341 (E.D.Pa. 1972), for the proposition that the defendants have not suffered any prejudice since they have lost nothing more than their "expenditures in promoting the infringed name." *Id.* at 1368 (quoting *Tisch Hotels, Inc. v. Americana Inn, Inc.,* 350 F.2d 609, 615 (7th Cir. 1965)). However, the court believes that the plaintiffs' reliance on *Dunhill* is misplaced for the following reasons.

The plaintiff in *Dunhill* was primarily interested in obtaining an injunction, not money damages. *Id.* at 1369. As a result, the district court never considered whether the plaintiff's failure to provide the defendant with timely notice of its offensive activities denied that party the opportunity to avoid incurring significant monetary penalties by altering its behavior before it had made a significant investment in its product. *But see Wanlass,* 148 F.3d at 1337 (citing *Aukerman,* 960 F.2d at 1033). Moreover, in its conclusion, the *Dunhill* court emphasized, an accounting of the defendants' profits or an

b.  The defendants have also suffered extraordinary evidentiary prejudice.

Moreover, in addition to this severe financial prejudice, the defendants have suffered extreme evidentiary prejudice since, as the plaintiffs themselves admit, all of the central characters in this litigation have passed away; some over fifty years ago. *See Robinson v. Linfield College,* 42 F.Supp. 147, 157–58 (E.D.Wash.1941) (recognizing the defense of laches in a case where, "[w]ith the exception of [one individual], there [wa]sn't a person alive ... who ha[d] any knowledge about the facts of what occurred" at the time of the alleged wrong in 1916, especially since "these parties waited until the property in question had been enhanced in value [to roughly] $100,000"). Specifically, Eugenia died in 1958. Her daughter, Tatyana, passed in 1977. Thus, the only living person who can testify about the beliefs and actions of these two women is Boris, who is now over eighty years old and who, at the time of most of the relevant historical events, was barely a teenager.[30]

Furthermore, Vladimir died in 1934; Kunnett in 1979; and Martin in 1986. However, as the court will soon discuss, the plaintiffs anchor their lawsuit in the events which surrounded a series of transactions in 1933 and 1939 which occurred between these three individuals. As a consequence, the defendants cannot possibly refute the allegations concerning what these individuals may or may not have known over sixty years ago. *Cf. Maschmeijer v. Ingram,* 97 F.Supp. 639, 641 (S.D.N.Y.1951) (refusing to strike a laches defense in an action for, *inter alia,* unfair competition where the complaint was filed "after the death of the president of the two defendant corporations, who [wa]s alleged to have been the only one familiar with the [relevant] transactions").

For this reason, the court finds that the delay in bringing this suit has resulted in severe evidentiary prejudice as well.[31]

---

award of money damages would be inequitable, 350 F.Supp. at 1369, arguably for this very reason.

30.  For example, while the plaintiffs claim that Eugenia wrote several letters to friends and family members who were still living in the Soviet Union after the Bolshevik Revolution, the only evidence that the plaintiffs introduce to support these contentions is the testimony of Eugenia's grandson Boris, who has stated that his "grandmother ... wrote to Russia, not knowing whether the letters reached their destination or not because, in theory, only one in ten letters was answered."

31.  Thus, although the plaintiffs claim that their opponents' ability to defend this lawsuit has not been impaired because "virtually all of the documents at the heart of this litigation are already in evidence," the court cannot ignore the reality that none of these documents shed any clear light on what the key witnesses in this lawsuit knew or believed 1933 or 1939. Moreover, all of these individuals passed away many years ago. As a result, the court cannot agree with the plaintiffs' contention that "additional discovery" has shown that the defendants suffer no prejudice as a result of the sixty-year delay in filing suit. In fact, the court is inclined to reach the exact opposite conclusion.

For example, the plaintiffs cite to a partially transcribed conversation that occurred between Kunnett, Martin, and an individual named G.K. Bernstein in 1976 in an attempt to show the defendants have preserved in their files several "incriminating admissions" made by these executives. However, a review of this transcript shows only that, at some point in time either before or after the 1933 agreement, Vladimir told Kunnett that he had an older brother named Peter who was an owner of the original trade house but was either dead or presumed to be dead. The document makes no mention of whether, in either 1933 or 1939, Kunnett knew that Vladimir had signed away his rights to the family name in 1904.

In addition, while Kunnett and Martin did discuss an attempt by Vladimir's widow, Tatiana, to "blackmail" Heublein 1952, the portions of the transcript relating to this subject are littered with omissions. As a consequence, the court cannot discern what "terrible" information, if any, Tatiana possessed. Furthermore, the death of both Kunnett and Martin, the passing of Tatiana in 1982, and the loss or absence of records which might clarify this conversation makes this determination impossible.

For these reasons, the court cannot conclude that the additional discovery produced

Consequently, the court finds that recognizing a laches defense is entirely appropriate at this time and grants summary judgment in favor of the defendants.

4. Given the events that have transpired over past sixty years, the defendants' conduct or knowledge is irrelevant to the court's laches analysis.

Finally, throughout this litigation, the plaintiffs have ascribed the most invidious motives to the defendants, alleging that they have knowingly perpetrated a global fraud upon the consumer public by attempting to pass their SMIRNOFF vodka off the as "true" SMIRNOV vodka made by the original trade house.[32] As a result, the plaintiffs claim that the defendants cannot come before this court to assert the equitable defense of laches because their hands are not clean. *But see Intertech Licensing Corp. v. Brown & Sharpe Mfg. Co.*, 708 F.Supp. 1423, 1439 (D.Del.1989). However, even if it the court were to take the plaintiffs' unsupported allegations as being true, it would still find that the plaintiffs' lawsuit is barred by the doctrine laches, regardless of the cleanliness of the defendants' hands.

In particular, even if the court assumed that (1) Kunnett knew that Vladimir had no rights in or to the SMIRNOFF name and (2) this knowledge was conveyed to Heublein when it purchased whatever "rights" were conveyed to Kunnett, the Third Circuit has noted that the doctrine that a "fraudulent infringer cannot expect tender mercy of a court of equity ... has its limits." *See Anheuser–Busch*, 175 F.2d at 374. Specifically, as the *Anheuser–Busch* court stated, in the face of "a lapse of a hundred years or more, we think it highly dubious that any court of equity would grant ... relief against even a fraudulent infringer." *Id.* In support of this statement, the *Anheuser–Busch* court relied, in part, upon the doctrine of adverse possession, which essentially allows a person who is "deliberately trespassing on the land of another and openly claiming it to be his own" to gain title to that piece of land as long as he has occupied it for a certain length of time. *Id.* In a similar fashion, a defendant who has been "openly claiming ownership of [a mark] in defiance of the exclusive right asserted" by a plaintiff, who knows of this use, should be able to "likewise acquire immunity to legal process by [the plaintiff] on that score." *Id.*

■■■ In other words, by openly, notoriously, hostilely, and continuously using a particular mark in commerce for an extraordinarily lengthy period of time, a party should be able to obtain the right to use that mark, to the exclusion of all others, by mere operation of time and use. This result comports with the notion that the trademark laws serve as a tool for protecting the accumulated good will of a particular business. *See G.D. Searle & Co. v. Hudson Pharmaceutical Corp.*, 715 F.2d 837, 842 (3d Cir.1983) (quoting *Prestonettes, Inc. v. Coty*, 264 U.S. 359, 368, 44 S.Ct. 350, 68 L.Ed. 731 (1924) (Holmes, J.)); *see also Anheuser–Busch*, 175 F.2d at 374 n.7 (citing *United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 97–98, 39 S.Ct. 48, 63 L.Ed. 141 (1918)). In other words, a business which actually makes and sells products under a certain name, even a name that has been stolen from

during the course of this litigation sufficiently rebuts either the presumption or the showing of prejudice suffered by the defendants. *See, e.g., Dymo Industries, Inc. v. Monarch Marking Systems, Inc.*, 474 F.Supp. 412, 415 (N.D.Tex.1979); *Boris v. Moore*, 152 F.Supp. 602, 604–08 (E.D.Wis.1957).

**32.** On this point, the plaintiffs essentially allege that the defendants "have known from the beginning" that Kunnett somehow knew that Vladimir had relinquished all rights he had to the SMIRNOFF or SMIRNOV name and was thus aware that the 1933 agreement conveyed no actual or valid legal rights whatsoever. *But see* Note 31 *supra.* Apparently, the plaintiffs also contend this knowledge can be attributed to Heublein because following the 1939 agreement Kunnett became vice president of the company and, thereafter, shared this knowledge with other Heublein executives.

another, is building up a certain amount of "good will" in the marketplace, albeit in a rather "bad" way. However, if the company whose name has been stolen never complains about this theft in any way or if the individuals who once ran that company do nothing to try to win back that name, then the company that has "wrongfully" acquired the name should nonetheless be afforded the right to use it. *Cf. Jacobs v. Iodent Chem. Co.*, 41 F.2d 637, 640 (3d Cir.1930) (concluding that a plaintiff, who owns a valid trademark but fails to take reasonable steps to protect it in the face of a competitor that is investing its "efforts and money in establishing and expanding a business" under the same name, cannot obtain equitable or legal relief for activities that he "stood by and let" happen). At a minimum, the "true" owner of the name should not be allowed to profit from the subsequent investment made by the other. *Cf. G.F. Heublein & Bros. v. Bushmill Wine & Prods. Co.*, 55 F.Supp. 964, 969–70 (M.D.Pa.1944) (recognizing that "it cannot be equitable for a well-informed merchant with knowledge of a claimed invasion of [a] right to wait [and] see how successful his competitor will be and then destroy, with the aid of court decree, much [of w]hat the competitor has striven for and accomplished") (quoting *Valvoline Oil Co. v. Havoline Oil Co.*, 211 F. 189, 195 (S.D.N.Y. 1913)). As the *Heublein* court noted,

> to permit another to build up a reputation for one's goods under a trade name for a long period of time, and then to assert an exclusive right to that name, and thereby acquire the benefit and reputation of and trade which the other has built up, when it lay in the power of the former at any time to have arrested the use of the trade name by the latter, seems ... most inequitable because, if the right had been asserted before the reputation [had been] acquired, the infringer could have adopted another name and built his reputation upon it.

*Id.* (quoting *Old Lexington Club Distillery Co. v. Kentucky Distilleries & Warehouse Co.*, 234 F. 464, 469 (D.N.J.1916)).

For these reasons, even if the court assumes that the defendants knowingly misappropriated the SMIRNOFF name and associated marks back in the 1930s, it would still conclude that laches bars the plaintiffs' action today because, all the while, the plaintiffs or, more accurately, their predecessors were aware of this activity yet did nothing but stand by and watch. *See Jacobs*, 41 F.2d at 640. Thus, although the plaintiffs did manage to file suit in this century, the court cannot help but notice that it took over sixty years to do so, a delay which is far closer to one hundred years than it is to five or ten or, for that matter, even twenty. *Cf. Anheuser–Busch*, 175 F.2d at 374. For this reason, even if the defendants had come before this court with the most soiled hands imaginable, the plaintiffs' action would still be barred by the doctrine of laches given their extraordinary delay in bringing suit and the series of significant events that have taken place in the interim.

## V. CONCLUSION.

Because the plaintiffs have failed to take sufficient preparatory steps to evince an immediate intent and an actual ability to enter the U.S. market, they have failed to present this court with a justiciable case or controversy which is ripe for decision. Furthermore, because of their absence from the marketplace and their nebulous commercial interests, the court cannot conclude that they have standing to maintain their statutory claims. Finally, even if the plaintiffs could overcome these deficiencies, their action is barred under the doctrine of laches as a consequence of the severe financial and evidentiary prejudice suffered by the defendants resulting from the plaintiffs' unprecedented delay in bringing this suit.

For these reasons, the court will grant summary judgment in favor of the defendants on all of the claims raised by the plaintiffs' in this action. Because the court finds for the defendants on these grounds,

it declines to address the multitude of other arguments raised in the balance of the their moving papers. An appropriate order shall issue.